937 P.2d 397

Jack T. KONNO; Samuel K. Kalua, III; Gary W. Rodrigues; United Public Workers, AFSCME, Local 646, AFL–CIO, Plaintiffs–Appellants,

v.

COUNTY OF HAWAI'I; Stephen K. Yamashiro; Donna Fay K. Kiyosaki; Richard Wurdeman; Michael Ben, as Director of Department of Personnel, County of Hawai'i; Spencer Kalani Schutte; Takashi Domingo; Jimmy Arakaki; Keola Childs; Jim Rath; John Does 1–10; Jane Does 1–10; Doe Corporations 1–10; Doe Partnerships 1–10; Roe Non–Profit Organizations 1–10; and Roe Governmental Entities 1–10, Defendants–Appellees;

and

Waste Management of Hawai'i, Inc., Intervenor/Defendant–Appellee.

UNITED PUBLIC WORKERS, AFSCME, LOCAL 646, AFL–CIO, Complainant–Appellee/Cross–Appellant–Appellant/Cross–Appellee/Cross–Appellee,

v.

Stephen K. YAMASHIRO and Donna Fay Kiyosaki, Respondents–Appellants/Cross–Appellees–Appellees/Cross–Appellees/Cross–Appellees;

and

Richard Wurdeman, Esq.; Spencer Kalani Schutte; Takashi Domingo; Jimmy Arakaki; Keola Childs; Jim Rath, Respondents–Cross–Appellees–Appellees/Cross–Appellees/Cross–Appellees;

and

Waste Management of Hawai'i, Inc., Intervenor–Cross–Appellee–Appellee/Cross–Appellant/Cross–Appellee;

and

Hawai'I Labor Relations Board; Bert M. Tomasu; Russell T. Higa; Sandra H. Ebesu, Appellees/Cross–Appellees–Appellees/Cross–Appellees/Cross–Appellants.

Nos. 18203, 18236.

Supreme Court of Hawai'i.

Feb. 28, 1997.

Order Modifying Decision on Reconsideration May 13, 1997.

Herbert Takahashi, Stanford H. Masui, Danny J. Vasconcellos and Rebecca L. Covert of Takahashi, Masui & Vasconcellos, on the briefs, Honolulu, for plaintiffs-appellants in No. 18203.

Mark Bennett of McCorriston, Miho & Miller, on the briefs, Honolulu, for defendants-appellees in No. 18203.

John Knorek of Torkildson, Katz, Jossem, Fonseca, Jaffe, Moore & Hetherington, on the briefs, Honolulu, for intervenor/defendant-appellee in No. 18203.

Herbert Takahashi, Stanford H. Masui, Danny J. Vasconcellos and Rebecca L. Covert of Takahashi, Masui & Vasconcellos, on the briefs, Honolulu, for complainant–appellee / cross – appellant – appellant/ cross–appellee/cross-appellee in No. 18236.

William C. McCorriston, Mark J. Bennett and Nadine Ando of McCorriston, Miho & Miller, on the briefs, Honolulu, for respondents-appellants/cross-appellees-appellees/cross-appellees/cross-appellees and respondents-cross-appellees-appellees/cross-appellees/cross-appellees in No. 18236.

Robert S. Katz, Richard M. Rand and John L. Knorek of Torkildson, Katz, Jossem, Fonseca, Jaffe, Moore & Hetherington, on the briefs, Honolulu, for intervenor-cross-appellee-appellee/cross-appellant/cross-appellee in No. 18236.

Valri Lei Kunimoto, Hawai'i Labor Relations Board, on the briefs, Honolulu, for appellees/cross-appellees-appellees/cross-appellees/cross-appellants in No. 18236.

Herbert R. Takahashi and Rebecca L. Covert of Takahashi, Masui & Vasconcellos, Honolulu, for plaintiffs-appellants in No. 18203 and for complainant–appellee/cross-appellant-appellant/cross–appellee/cross–appellee in No. 18236 on the answer.

Richard M. Rand and John L. Knorek of Torkildson, Katz, Fonseca, Jaffe, Moore & Hetherington, Honolulu, for intervenor/defendant-appellee in No. 18203 and for intervenor-cross-appellee-appellee/cross-appellant/cross-appellee in · No. 18236 on the motion.

William C. McCorriston, Mark J. Bennett and Nadine Ando of McCorriston, Miho & Miller, Honolulu, for defendants-appellees in No. 18203 and respondents-appellants/cross-appellees-appellees/cross–appellees/cross–appellees and respondents-cross-appellees-appellees/cross-appellees/cross-appellees in No. 18236 on the motion.

Jonathan Chun, First Deputy County Attorney, Lihue, on the amicus curiae memorandum of County of Kauai.

Michael J. Belles, David W. Proudfoot and Jerilynn Ono Hall of Belles Graham Proudfoot & Wilson, Lihue, on the amicus curiae brief of Sanifill of Hawaii, Inc.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

1. By order dated September 1, 1994, Nos. 18236, 18260, and 18304 were consolidated for briefing and disposition under No. 18236. Although Nos. 18203 and 18236 were not consolidated on appeal and were independently briefed, we address them together in this opinion because they arise from the same underlying factual events and because our disposition in No. 18203 directly affects No. 18236. *See Birmingham v. Fodor's Travel Publications, Inc.*, 73 Haw. 359, 365 n. 2, 833 P.2d 70, 74 n. 2 (1992).

RAMIL, Justice.

The central issue addressed in these cases [1] is the privatization of public services. The United Public Workers and its officers (collectively the UPW) challenge the validity of a contract entered into by the County of Hawai'i (the County) to privatize the operation of a landfill at Pu'uanahulu on the island of Hawai'i. In No. 18203, the UPW argues that the County violated civil service laws and merit principles by privatizing the landfill worker positions in question. In No. 18236, the UPW argues that the County violated collective bargaining laws by privatizing without participating in mandatory negotiations with the UPW. For the reasons discussed below, we hold that the County violated civil service laws and merit principles but did not violate collective bargaining laws. The contract between the County and Waste Management of Hawai'i, Inc. (WMI) is void as a violation of public policy to the extent that it provides for the private operation of the Pu'uanahulu landfill. We vacate the circuit court's award of summary judgment in favor of the County in No. 18203 and remand for entry of summary judgment in favor of the UPW. We instruct the circuit court to grant the UPW a declaratory judgment. We further instruct the circuit court to fashion injunctive relief requiring the landfill to be transferred from private operation to County operation as rapidly as possible but consistent with practical and public interest concerns. The circuit court shall also monitor the transition and may impose sanctions for non–compliance. Finally, the circuit court is to determine whether the additional relief requested by the UPW is appropriate. We affirm the circuit court's judgment in No. 18236.

## I. FACTS

### A. Common Facts

Prior to the events at issue in this opinion, the County owned and operated two landfills

on the island of Hawai'i: one in Kealakehe, Kona, and the other in Hilo. The Department of Public Works employed thirty-eight workers, consisting of equipment operators, landfill attendants, and transfer station attendants, to operate the landfills. These workers were traditionally recruited and employed through the merit system pursuant to civil service laws. The UPW is a labor union and has long been the exclusive representative of landfill workers in the state of Hawai'i.

In 1991, Mayor Lorraine Inouye began to consider the possibility of having a private contractor construct and operate a new landfill at Pu'uanahulu. The new landfill would be a replacement for the Kealakehe landfill, which had reached capacity and was plagued by subterranean fires. Another concern was that the Environmental Protection Agency (EPA) had issued new federal regulations on solid waste management that contained strict standards for landfill construction. Mayor Inouye met with UPW officials to discuss the privatization proposal. The UPW did not oppose the private construction of the new landfill but did strenuously object to the private operation of the landfill. In the summer of 1992, Mayor Inouye agreed not to privatize the operation of the landfill.

Subsequent to her decision not to privatize the landfill, Mayor Inouye won the endorsement of the UPW in the 1992 primary election. This was an extremely close race, and Mayor Inouye lost to Stephen Yamashiro by a thin margin. Shortly after assuming office in December 1992, Mayor Yamashiro announced that the County would be privatizing not only the construction of the Pu'uanahulu landfill, but its operation as well. In March 1993, bids were received from WMI and Browning Ferris Industries. On March 25, 1993, County officials informed WMI that the County intended to award WMI the contract.

County officials did not seek any form of certification from the county personnel director or the civil service commission that the landfill worker positions were unique or that they could not be filled through normal civil service procedures. Furthermore, Mayor Yamashiro did not consider the decision to privatize the landfill to be subject to mandatory bargaining. The County did inform the UPW, in February 1993, that bids were being accepted from private contractors and also sent a letter to the UPW, on April 1, 1993, offering to "consult" with it. However, the UPW responded by demanding full "bargaining in good faith as required by law." Mayor Yamashiro then refused the UPW's demand for full bargaining.

A contract with WMI, dated April 21, 1993, was executed by Mayor Yamashiro on April 30, 1993. Under the terms of the contract, WMI assumed responsibility for the construction, operation, and closure of the new landfill. The County was to pay WMI based on the amount of waste received. WMI also agreed to assume liability for claims arising from the landfill and to carry environmental and liability insurance.

Although the County refused to bargain with the UPW over the decision itself, by letter dated September 2, 1993, the County offered to bargain over the effects of privatization. There is no indication in the record that the UPW responded to the County's offer.

Ten workers at the Kealakehe landfill were directly affected by the County's privatization efforts. Workers at Kealakehe were given the option of relinquishing their civil service status and working for WMI at Pu'uanahulu or being reassigned to other civil service positions. The actual work performed by the workers at the new landfill is virtually identical to the work performed at the old landfill. The only difference is that equipment operators who formerly spent half their time trucking and half bulldozing waste now spend their entire time trucking waste.

B. *No. 18203*

On May 6, 1993, the UPW filed a complaint in the Third Circuit Court, claiming, *inter alia,* that the County had violated constitutionally mandated merit principles and civil service statutes. The complaint requested damages, as well as declaratory and injunctive relief. WMI was subsequently allowed to intervene in the action. An amended complaint was filed on May 27, 1993, reasserting the above-mentioned claims. The County

moved for summary judgment on July 26, 1993. After holding hearings on August 4 and December 27, 1993, the circuit court granted the motion. In its order dated February 4, 1994, the court ruled:

> The contract with Waste Management Inc. is for disposal of solid waste and other services related to operation of Kona and Hilo landfills. Haw.Rev.Stat. § 46–85 authorizes such a contract. There will be no elimination of jobs currently held by civil servants, and thus there is no violation of Civil Service laws. The contract was legally executed in accordance with the Hawaii County Charter; specifically §§ 13–13 and 10–11. The motivation of Defendants in undertaking this contract is hotly challenged. However, this does not constitute a material fact in relation to the legal issues in this case. Therefore, there is no dispute of material facts and summary judgment is granted in favor of Defendants. This decision represents a ruling on the sole issue of the legality of the contract between the County of Hawaii and Waste Management.

The court entered final judgment on June 30, 1994. This timely appeal followed.

### C. *No. 18236*

On May 4, 1993, the UPW filed a prohibited practice complaint with the Hawai'i Labor Relations Board (HLRB) against Mayor Yamashiro and other officials of Hawai'i County (collectively the County). The HLRB allowed WMI to intervene on July 14, 1993. On September 7, 1993, the UPW filed an amended complaint containing the following claims: (1) Count I—that the County violated an agreement negotiated by former Mayor Inouye that the County would not privatize operation of the new landfill; (2) Count II—that the County's actions violated section 1.05 of the existing collective bargaining agreement; (3) Count III—that Mayor Yamashiro's decision to privatize was in retaliation for the UPW's support of former Mayor Inouye in the 1992 primary election; and (4)

Count IV—that the County violated HRS § 89–13(a) in refusing to bargain with the UPW because privatization is subject to mandatory collective bargaining.

Hearings were held in Honolulu and Hilo from August 10 to September 28, 1993. On February 1, 1994, the HLRB delivered an extensive written decision. Regarding Count I of the amended complaint, the HLRB found that former Mayor Inouye had agreed with the UPW that she personally would not privatize the operation of the new landfill. However, the HLRB ruled that her actions did not constitute a negotiated settlement of a grievance or a mid-term agreement that was binding on the County. Therefore, the HLRB deemed Count I meritless.

As for Count II of the amended complaint, the HLRB ruled that section 1.05 of the collective bargaining agreement had not been violated.[2] The HLRB decided that the County had fulfilled its duty to consult over personnel policies, practices, and matters affecting working conditions when it informed the UPW, in February 1993, that it would be accepting bids from private contractors and when it offered to consult with the UPW in its letter dated April 1, 1993. The HLRB further decided that section 1.05 only requires mutual consent when contract provisions pertaining to wages, hours, and working conditions are *altered* and that privatization did not change these specific provisions. Therefore, the HLRB also determined that Count II was meritless.

As for Count III, the HLRB found that there was insufficient evidence to support the UPW's allegations of political motivation. Accordingly, the HLRB ruled that the allegations were speculative and without merit.

Regarding Count IV, the HLRB noted that although all matters affecting wages, hours, and the terms and conditions of employment are subject to negotiation and bargaining, certain management rights enumer-

---

2. Section 1.05 provides:
 The Employer agrees that it shall consult the Union when formulating and implementing personnel policies, practices and any matter affecting working conditions. No changes in wages, hours or other conditions of work contained herein may be made except by mutual consent.

ated in HRS § 89–9(d) are nonnegotiable.[3] The HLRB ruled that the decision to privatize the landfill at Puʻuanahulu was a valid exercise of management rights and was therefore not subject to mandatory bargaining. However, the HLRB went on to rule that the secondary impact of managerial decisions on conditions of employment must be negotiated before the decision may be implemented. The HLRB found that, although no employees were laid-off or transferred by the decision to privatize, there was a substantial impact on the terms and conditions of employment due to the loss of job opportunities (in the form of promotions, transfers, and temporary assignments for bargaining unit members) and the denial of the opportunity for bargaining unit expansion. Thus, the County was obligated to negotiate over the effects of the decision to privatize. Because the County refused to bargain over these effects, the HLRB ruled that the County had violated HRS § 89–13(a)(5).[4] The HLRB then ordered the parties to meet and bargain over the impact of the County's decision to privatize. If the parties could not reach an agreement, the contract would be terminated and the County would assume full responsibility for the operation of the landfill.

The County filed a notice of appeal to the Third Circuit Court on February 8, 1994, and the UPW filed a notice of cross-appeal on March 1, 1994. Oral argument was heard on May 20, 1994. In its order dated July 5, 1994, the circuit court first ruled that the HLRB had erroneously allowed WMI to intervene in the case when WMI was not a proper party; however, the court found that the substantial rights of the UPW had not been prejudiced by WMI's intervention and that reversal was not justified on that basis.

The court further ruled that the HLRB's reasoning as to Counts I, II, and III of the amended complaint was sound and therefore affirmed the HLRB's decision as to those counts.

As for Count IV, however, the court reversed the HLRB. The court held:

> The Court finds, except as noted below, that the HLRB's conclusions and determinations with regard to effects bargaining are clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. The reliable, probative, and substantial evidence on the whole record establishes that the UPW sought to have the County negotiate as to the decision to privatize and not its effects. The County's beliefs as to non-negotiability went to the issue of decision bargaining, not effects bargaining. As set forth at page 23 of the HLRB Final Order, the County acknowledged a legal requirement to participate in effects bargaining, and Mr. [Michael] Ben[, Personnel Director for the County,] admitted that the effects of contracting out required consultation with the Union. There is no evidence to support a finding that the County ever refused after a request from the UPW to participate in effects bargaining. In fact, the evidence is that the County's efforts to negotiate effects were rebuffed by the UPW. Thus, the HLRB's decision that the County committed a prohibited practice is REVERSED and the entire "Order" of the HLRB set forth on page 32 of the HLRB Final Order is REVERSED.

The court entered final judgment on July 5, 1994. This timely appeal followed.

---

3. HRS § 89–9(d) (1993) excludes from negotiation matters that would interfere with the rights of a public employer to:
 (1) direct employees; (2) determine qualifications, standards for work, the nature and content of examinations, hire, promote, transfer, assign and retain employees in positions and suspend, demote, discharge, or take other disciplinary action against employees for proper cause; (3) relieve an employee from duties because of lack of work or other legitimate reasons; (4) maintain efficiency of government operations; (5) determine methods, means and personnel by which the employer's operations

are to be conducted; and take such actions as may be necessary to carry out the missions of the employer in cases of emergencies[.]

4. HRS § 89–13 (1993) provides in relevant part:
 **Prohibited practices; evidence of bad faith.** (a) It shall be a prohibited practice for a public employer or its designated representative wilfully to:
 . . . .
 (5) Refuse to bargain collectively in good faith with the exclusive representative as required in section 89–9[.]

## II. DISCUSSION

### A. Whether the County Violated Civil Service Laws and Merit Principles (No. 18203)

#### 1. Background Information

Before addressing the County's privatization effort in the present dispute, useful background information can be obtained by examining the policies behind privatization, the policies behind the civil service, and the approaches taken by other states.

The term "privatization" is a broad term that has been used to describe a wide range of activity. *See generally* Ronald A. Cass, *Privatization: Politics, Law, and Theory*, 71 Marq. L.Rev. 449, 451 (1988). "Privatization refers to the shift from government provision of functions and services to provision by the private sector." George L. Priest, *Introduction: The Aims of Privatization*, 6 Yale L. & Pol'y Rev. 1, 1 (1988). In countries other than the United States, privatization usually refers to the selling of government owned and operated businesses to private enterprise. Cass, *supra*, at 450. However, another type of privatization, which is at issue in the present dispute, is known as "contracting out." This activity can be defined as "the transfer by governmental entities of responsibility for the performance of desired functions, mostly of a personal service (*i.e.* administrative) nature, to private institutions" or "the replacement of members of [a] bargaining unit by the employees of an independent contractor performing the same work under similar conditions of employment." Timothy P. Dowling, Note, *Civil Service Re-*

strictions on Contracting Out by State Agencies, 55 Wash. L.Rev. 419, 419 n.3 (1980).

The purported policy behind privatization is to increase governmental efficiency. *Id.* at 425–26. Services can often be provided more efficiently by private entities than by civil servants. *Id.* The productivity of civil servants can be enhanced in that the threat of privatization serves as an incentive to improve performance. *Id.* at 426. Privatization may also give public employers increased leverage in labor negotiations, thus avoiding costly labor disputes. *Id.*

In contrast to privatization, the purpose of the civil service is not just to foster efficiency but to implement other policies as well. Craig Becker, *With Whose Hands: Privatization, Public Employment, and Democracy*, 6 Yale L. & Pol'y Rev. 88, 94–99 (1988). One obvious policy is the elimination of the "spoils system," which awarded jobs based on political loyalty. *Id.* at 95. The civil service also embodies positive principles of public administration such as openness, merit, and independence. *Id.* at 95–96. Openness is served through public announcement of job vacancies, clear articulation of qualifications, open application to all persons, and selection according to objective criteria. *Id.* at 96. Merit is served through a system of competitive examinations and qualification standards aimed at identifying competent candidates. *Id.* Independence is served through the job security provided by civil service laws; because civil servants can be terminated only for just cause, they are more likely to speak out against unlawful activities occurring in their agencies. *Id.* at 98.[5] Justice William

---

5. Hawai'i civil service laws, located in HRS chs. 76 and 77, are also based on these policies. HRS § 76–1 (Supp.1996) provides in relevant part:

**Purposes of this chapter; statement of policy.** It is the purpose of this chapter to establish in this State and each of the counties a system of personnel administration based on merit principles and scientific methods governing the classification of positions and the employment, conduct, movement, and separation of public officers and employees. It is also the purpose of this chapter to build a career service in government which will attract, select, and retain the best of our citizens on merit, free from coercive political influences, with incentives in the form of genuine opportunities

for promotions in the service, which will eliminate unnecessary and inefficient employees, and which will provide technically competent and loyal personnel to render impartial service to the public at all times, and to render such service according to the dictates of ethics and morality. In order to achieve these purposes it is the declared policy of the State that the personnel system hereby established be applied and administered in accordance with the following merit principles:

(1) Equal opportunity for all regardless of race, sex, age, religion, color, ancestry, or politics. No person shall be discriminated against in any case because of any disability, in examination, appointment, reinstatement, reemployment, promotion, transfer, demo-

O. Douglas called the civil service system " 'the one great political invention' of nineteenth century democracy." *United Public Workers v. Mitchell,* 330 U.S. 75, 121, 67 S.Ct. 556, 580, 91 L.Ed. 754 (1947) (Douglas, J., dissenting in part) (quoting G. Wallas, *Human Nature in Politics* 263 (2d ed.)).

Insofar as a job position that is privatized is, by definition, removed from the civil service system, there is a tension between privatization and the civil service. There are three basic approaches that other states have taken in dealing with this tension. *See* Becker, *supra,* at 99–103. The first approach has been called the "nature of the services" test. According to this approach, services that have been "customarily and historically provided by civil servants" cannot be privatized, absent a showing that civil servants cannot provide those services. *Washington Fed'n of State Employees, AFL–CIO v. Spokane Community College,* 90 Wash.2d 698, 585 P.2d 474, 477 (1978) (en banc). In *Spokane,* a state community college attempted to contract out custodial services for a new administration building. *Id.* 585 P.2d at 476. Custodial services had been historically provided by civil service employees of the college. *Id.* Despite the fact that the contract would have reduced the cost of custodial services sub-

stantially, the Washington Supreme Court held that the contract violated state civil service statutes. *Id.* The court noted that privatization contravenes the basic policy and purpose of the civil service statutes and held the contract to be void. *Id.* 585 P.2d at 476–77. *See also State Compensation Ins. Fund v. Riley,* 9 Cal.2d 126, 69 P.2d 985 (1937); *Burum v. State Compensation Ins. Fund,* 30 Cal.2d 575, 184 P.2d 505 (1947); [6] *Jack A. Parker & Assoc., Inc. v. State,* 454 So.2d 162 (La.Ct.App.), *cert. denied,* 459 So.2d 538 (La. 1984); *Joint Crafts Council and Teamsters Union Local 117 v. King County,* 76 Wash. App. 18, 881 P.2d 1059 (1994).

The second approach is known as the "functional inquiry" test. Under this test, the focus shifts from the type of services to be performed to the particular state program or function involved. New state programs performing new functions are not constrained by civil service laws. Thus, new programs may contract out services even if those services are of a type that can be performed by civil servants. *See Department of Transp. v. Chavez,* 7 Cal.App.4th 407, 9 Cal.Rptr.2d 176 (1992); *California State Employees' Ass'n v. Williams,* 7 Cal.App.3d 390, 86 Cal.Rptr. 305, *reh'g denied,* 86 Cal.Rptr. 312 (Cal.Ct.App. 1970).[7]

---

tion, or removal, with respect to any position the duties of which, in the opinion of the director of human resources development may be efficiently performed by a person with such a disability; provided that the employment will not be hazardous to the appointee or endanger the health or safety of the appointee's co-workers or others;
(2) Impartial selection of the ablest person for government service by means of competitive tests which are fair, objective, and practical;
(3) Just opportunity for competent employees to be promoted within the service;
(4) Reasonable job security for the competent employee, including the right of appeal from personnel actions;
(5) Systematic classification of all positions through adequate job evaluations; and
(6) Proper balance in employer-employee relations between the people as the employer and employees as the individual citizens, to achieve a well trained, productive, and happy working force.

6. Subsequent decisions of the California Court of Appeal have expanded upon the exception to the nature of the services test that permits privatiza-

tion when the services cannot be provided by civil servants. *See, e.g., California State Employees' Ass'n v. State,* 199 Cal.App.3d 840, 245 Cal. Rptr. 232 (1988). These cases hold that "at some point a service which is more costly when performed under civil service than when contracted out may on that account be one which cannot be performed satisfactorily, adequately or competently" by civil servants. *Id.* 245 Cal. Rptr. at 238. Under Hawai'i law, HRS § 76–77(7) already recognizes this exception, although it also includes procedural constraints such as certification by the personnel director and a one-year time limit. However, inasmuch as the current discussion involves the initial scope of civil service coverage and not the exceptions, the California Court of Appeal cases do not affect our analysis.

7. In *Williams,* the California Court of Appeal noted that it did not have the authority to overrule the California Supreme Court's decisions in *Riley* and *Burum. Williams,* 86 Cal.Rptr. at 313 (denial of rehearing). However, the Court of Appeal distinguished *Williams* from *Riley* and *Burum* by arguing that *Riley* and *Burum* did not involve new state functions/programs. *Id.* Be-

The third approach can be called the "bad faith" test. Under this approach, privatization violates civil service laws only if the employer acts in "bad faith" or with intent to circumvent the civil service laws. This test reduces the protection of civil service laws to its narrowest degree. Under this approach, a public employer whose motive is economic efficiency is generally considered to act in "good faith." However, efficiency is almost always the justification given for privatization. Therefore, civil service laws are effective against privatization only in the rare instances in which there is actual proof of improper intent/motive. *See Ball v. Board of Trustees of State Colleges*, 251 Md. 685, 248 A.2d 650 (1968); *Michigan State Employees Ass'n v. Civil Service Comm'n*, 141 Mich. App. 288, 367 N.W.2d 850 (1985); *University of Nevada v. State Employees Ass'n, Inc.* 90 Nev. 105, 520 P.2d 602 (1974); *Collins v. Manhattan & Bronx Surface Transit Operating Auth.*, 62 N.Y.2d 361, 477 N.Y.S.2d 91, 465 N.E.2d 811 (1984).

### 2. *Analysis*

■■■ Due to the procedural history of No. 18203, we apply the following standard of review:

We review [a] circuit court's award of summary judgment *de novo* under the same standard applied by the circuit court. *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 104, 839 P.2d 10, 22, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992) (citation omitted). As we have often articulated:

[s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*Id.* (citations and internal quotation marks omitted); *see* Hawai'i Rules of Civil Procedure (HRCP) Rule 56(c) (1990). "A fact is

material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Hulsman v. Hemmeter Dev. Corp.*, 65 Haw. 58, 61, 647 P.2d 713, 716 (1982) (citations omitted).

*Dunlea v. Dappen*, 83 Hawai'i 28, 36, 924 P.2d 196, 204 (1996) (quoting *Hays v. City & County of Honolulu*, 81 Hawai'i 391, 392–93, 917 P.2d 718, 719–20 (1996)) (alterations in original) (emphasis and parenthetical comment omitted).

On appeal, the UPW argues that the circuit court erred in granting summary judgment because: (1) the County violated constitutionally mandated merit principles in privatizing the Pu'uanahulu landfill; (2) the County violated civil service statutes in privatizing the landfill; and (3) Mayor Yamashiro's alleged political motivation behind his privatization decision was a genuine issue of material fact.

■■■ Regarding constitutionally mandated merit principles, article XVI, section 1 of the Hawai'i Constitution provides: "The employment of persons in the civil service, as defined by law, of or under the State, shall be governed by the merit principle." By its express terms, this provision simply means that the civil service, however defined, is to be governed by merit principles. It does *not* define the precise scope of the civil service, *i.e.*, the particular job positions that are within the civil service. Instead, article XVI, section 1 expressly refers to other sources for a definition of "civil service." It states: "civil service, *as defined by law* . . . ." (Emphasis added.) Thus, in order to determine the scope of the term "civil service," we must examine statutory law and case law. For these reasons, we hold that the Hawai'i Constitution does not establish an independently enforceable right to the protection of merit principles.

In defining "civil service," the statute most relevant is HRS § 76–77:

cause a decision is not authority for a proposition not considered, *Riley* and *Burum* did not control. *Id.* 86 Cal. Rptr. at 310, 313. Thus, two rules apparently apply in California—the

*Williams* rule applies to new state functions/programs and the *Riley/Burum* rule applies to old state functions/programs. *Id.* at 313.

**Civil service and exemptions.** The civil service to which this part applies comprises all positions in the public service of each county, now existing or hereafter established, and embraces all personal services performed for each county, except the following:

. . . .

(7) Positions filled by persons employed by contract where the personnel director has certified and where the certification has received the approval of the commission that the service is special or unique, is essential to the public interest, and that because of the circumstances surrounding its fulfillment, personnel to perform the service cannot be recruited through normal civil service procedures; provided that no contract pursuant to this paragraph shall be for any period exceeding one year;

. . . .

(10) Positions specifically exempted from this part by any other state statutes[.]

HRS § 76–77 (1993).

■■■■ In interpreting statutes, this court has long held that

the fundamental starting point is the language of the statute itself. The interpretation of a statute is a question of law which this court reviews *de novo*. Moreover, where the language of the statute is plain and unambiguous, our only duty is to give effect to its plain and obvious meaning. When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. Put differently, a statute is ambiguous if it is capable of being understood by reasonably well-informed people in two or more different senses.

In construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning. Moreover, the courts may resort to extrinsic aids in determining the legislative intent. One avenue is the use of legislative history as an interpretive tool.

*State v. Toyomura*, 80 Hawai'i 8, 18–19, 904 P.2d 893, 903–04 (1995) (quoting *Housing Finance & Dev. Corp. v. Castle*, 79 Hawai'i 64, 76–77, 898 P.2d 576, 588–89 (1995)) (internal quotation marks, citations, ellipses, and brackets omitted). Furthermore, "[s]tatutory construction dictates that an interpreting court should not fashion a construction of statutory text that effectively renders the statute a nullity or creates an absurd or unjust result." *Dines v. Pacific Ins. Co., Ltd.*, 78 Hawai'i 325, 337, 893 P.2d 176, 188 (1995) (Ramil, J., dissenting) (citing *Richardson v. City & County of Honolulu*, 76 Hawai'i 46, 60, 868 P.2d 1193, 1207, *reconsideration denied*, 76 Hawai'i 247, 871 P.2d 795 (1994)).

HRS § 76–77 states that the civil service encompasses "all positions in the public service of each county, now existing or hereafter established, and embraces all personal services performed for each county." Clearly, the language "*all* positions" and "*all* personal services" indicates that "civil service" was meant to be read broadly. (Emphases added.) Nevertheless, we must not read the term so broadly as to lead to absurdity. For example, one could read "all positions in the public service" as literally meaning any position that provides a service to the public. However, such an interpretation would encompass employees of businesses such as Hawaiian Electric (electrical service), GTE Hawaiian Tel (telephone service), or even Bank of Hawai'i (financial services). It would clearly be absurd to suddenly and radically expand the civil service system to include employees of these organizations. Furthermore, we cannot read "civil service" as only including those employees who are paid regular salaries by the government. Such an interpretation would allow the state

or the counties to avoid civil service coverage simply by reducing the size of their official payroll. This would elevate form over substance and effectively render HRS § 76–77 a nullity. Because of these difficulties in interpreting the statute, we look to the three approaches utilized by other states for guidance.

Under the nature of the services test, the protection of civil service laws extends to those services that have been customarily and historically provided by civil servants. This approach has a number of advantages. First, it is the broadest of the three approaches and is therefore consistent with the broad coverage suggested by the language of the statute. Second, by limiting coverage to those types of services that have been customarily and historically performed by civil servants, it does not risk being applied so broadly as to lead to absurdity. Third, and most importantly, the nature of the services test focuses on the types of services performed rather than the particular programs or governmental functions involved or the intent or motive underlying the decision. This focus on services is consistent with the statutory language "all personal *services* performed in each county." (Emphasis added.)

Under the functional inquiry test, new state programs performing new functions are not subject to civil service laws. The problem with this approach is that it is inconsistent with the statutory language of HRS § 76–77. The statute provides that the civil service includes "all positions ... now existing *or hereafter established*." (Emphasis added.) Thus, the Hawai'i statute clearly encompasses new programs as well as old.

Under the bad faith test, civil service laws are violated only if the employer acts in bad faith or with intent to circumvent the civil service laws. The problem with this approach is that it is very narrow and therefore inconsistent with the broad statutory language of HRS § 76–77. Furthermore, the test focuses on the intent or motive underlying the privatization effort. Nothing in HRS § 76–77 indicates that intent or motive is relevant to civil service coverage at all.

■ Therefore, we deem the nature of the services test to be most consistent with the language of our statute. We hold that the civil service, as defined by HRS § 76–77, encompasses those services that have been customarily and historically provided by civil servants.

■ In the present dispute, the landfill worker positions at Pu'uanahulu are essentially the same positions as at Kealakehe. The actual work performed is basically the same except for a minor change in the duties of equipment operators. At Kealakehe, these positions were civil service positions, and Pu'uanahulu is a replacement landfill for Kealakehe. Furthermore, the landfill workers at Hilo also held civil service positions. Thus, the landfill workers at Pu'uanahulu are performing a service that has been customarily and historically provided by civil servants.[8] They are therefore within the civil service unless one of the exceptions enumerated in HRS § 76–77 applies.

Only two of the exceptions in HRS § 76–77 even remotely apply to the facts of the present dispute. Under HRS § 76–77(7), persons employed by contract are not within the civil service if the county personnel director certifies (with the approval of the civil service commission) that the service is special or unique, is essential the public interest, and that personnel cannot be recruited through normal civil service procedures. However, in the present dispute, the County made no effort to seek certification.

HRS § 76–77(10) provides that positions are not within the civil service if they are

8. The County and WMI argue that because the Pu'uanahulu landfill complies with new EPA regulations, the new landfill is completely different from the old landfill. We agree that the construction of the new landfill may be different from that of the old landfill. Indeed, because Hawai'i County has not constructed landfills in compliance with the strict new federal regulations in the past, one could argue that the construction of the new landfill does not involve a service customarily and historically provided by civil servants. Furthermore, the UPW does not challenge the private construction of the new landfill. However, the contract with WMI was for both the construction *and the operation* of the landfill. It is the operation of the landfill that conflicts with civil service laws and merit principles.

specifically exempted by other state statutes. The County and WMI rely on HRS § 46–85 as one such statute. If HRS § 46–85 does indeed include a specific exemption to civil service coverage, then clearly HRS § 76–77(10) would require us to hold that the landfill worker positions are not within the civil service.

HRS § 46–85 provides:

**Contracts for solid waste disposal.** Any other law to the contrary notwithstanding, a county is authorized from time to time to contract with users or operators of a project for the abatement, control, reduction, treatment, elimination, or disposal of solid waste, whether established or to be established under chapter 48E or as a public undertaking, improvement, or system under chapter 47 or 49, or otherwise.[9] The contract may be included in an agreement, may be for such periods as agreed upon by the parties, and, without limiting the generality of the foregoing, may include:

(1) Provisions for the delivery to the project of minimum amounts of solid waste and payments for the use of the project based on the delivery of the minimum amounts (which payments the political subdivision may be obligated to make, whether or not such minimum amounts are actually delivered to the project);

(2) Unit prices, which may be graduated; and

(3) Adjustments of the minimum amounts and the unit price.

The payments, unit prices, or adjustments need not be specifically stated in the contract but may be determined by formula if set forth in the contract. The contract may include provisions for the arbitration and reasonable restrictions against other disposal by the county or by other public or private entities or persons over which the county shall have jurisdiction of the substances covered by the contract while the contract is in force and disposal under the contract is practicable.

HRS § 46–85 (1993). This statute clearly authorizes the County to enter into contracts relating to disposal of solid waste; however, it mentions nothing about the civil service. HRS § 76–77(10) expressly states that to avoid civil service coverage, the positions must be "*specifically* exempted" by another state statute. (Emphasis added.) Inasmuch as HRS § 46–85 mentions nothing about civil service positions, it does not include a *specific* exemption. Therefore, under the plain meaning of HRS §§ 76–77(10) and 46–85, the landfill worker positions are still within the civil service.

Even assuming *arguendo* that HRS § 46–85 is ambiguous as to whether it contains an exemption to civil service coverage, the legislative history underlying the statute does not support the argument asserted by the County and WMI. The legislative history of HRS § 46–85 indicates that it was enacted as part of a bill intended to help finance the construction of garbage-to-energy plants through the issuance of special purpose revenue bonds. House Standing Committee Report No. 67 states: "This bill will assist in the development of a facility that will dispose of solid waste, as well as generate electricity." Hse. Stand. Comm. Rep. No. 67, in 1983 House Journal, at 862. Senate Standing Committee Report No. 671 states:

The purpose of this bill is to establish a means whereby pollution control projects for the disposal of solid waste can be financed by the counties through the issuance of special purpose revenue bonds.

Your Committee finds that sanitary landfills are a costly and inefficient method of disposing of the ever-increasing amounts of solid waste and that alternative methods of disposal must be pursued. The success of pollution control projects which also provide for waste recovery and cogeneration of electricity has been proven; however, the high costs of design and installation require financial assistance in the form of tax-exempt financing.

Sen. Stand. Comm. Rep. No. 671, in 1983 Senate Journal, at 1342. Therefore, the authorization to contract given to counties in

9. HRS ch. 48E authorizes "political subdivision pollution control special purpose revenue bonds." HRS ch. 47 authorizes "county bonds." HRS ch. 49 authorizes "revenue bonds."

HRS § 46–85 was intended to be used for garbage-to-energy plants, not landfills. Nothing in the legislative history of HRS § 46–85 indicates that the statute was intended to authorize privatization of landfills or to exempt landfill workers from civil service coverage. Thus, neither HRS § 76–77(7) nor HRS § 76–77(10) apply to the present dispute.

In summary, under HRS § 76–77, the landfill worker positions at Pu'uanahulu are within the civil service. Accordingly, they are governed by merit principles under article XVI, section 1 of the Hawai'i Constitution. As civil service positions, they are also subject to the civil service statutes contained within HRS chs. 76 and 77. Therefore, privatization of the operation of the new landfill deprived civil servants of the protections guaranteed in article XVI, section 1 and HRS chs. 76 and 77. Thus, the County violated constitutionally mandated merit principles and civil service statutes.[10]

We emphasize that nothing in this opinion should be interpreted as passing judgment, one way or the other, on the wisdom of privatization. Whether or not, as a policy matter, private entities should be allowed to provide public services entails a judgment ordinarily consigned to the legislature. Our decision today merely applies the civil service laws of this state to the example of privatization at issue in the present appeal.

As we have discussed above, privatization involves two important, but potentially conflicting, policy concerns. On the one hand, privatization purportedly can improve the efficiency of public services. On the other hand, privatization can interfere with the policies underlying our civil service, *i.e.*, elimination of the spoils system and the encouragement of openness, merit, and independence. Given the importance of these policy concerns and the potential conflict between them, clear guidance from the legislature is indispensable.

The Colorado Supreme Court invalidated an attempt to privatize highway services because neither the legislature nor administrative agencies had directly addressed the competing policy concerns underlying privatization. In *Colorado Association of Public Employees v. Department of Highways*, 809 P.2d 988 (Colo.1991) (en banc), the court held:

> The scope and characteristics of any plan of privatization and means by which such a plan is to be implemented require careful consideration. Legislation, rules, or some combination thereof establishing standards will be necessary to ensure that privatization does not subvert the policies underlying the state personnel system as a whole, rather than a case specific consideration of the effect of a particular privatization plan of a single state agency on individual employees.... At the time relevant to the present case, however, no one had analyzed whether or under what circumstances positions within the state personnel system can be eliminated consistent with the civil service protections in order to obtain the same services by contract with private sector providers. The legislature has not spoken concerning privatization, and no regulatory criteria or guidelines had been adopted by which an executive agency could determine whether privatization is permissible and, if so, under what circumstances. Because privatization so directly implicates both the personnel system as a whole and the specific protections accorded state personnel system employees under [the Colorado Constitution], standards regulating privatization must be established by legislation, regulation, or some combination of the two.

*Id.* at 994–95. *See also Horrell v. Department of Admin.*, 861 P.2d 1194 (Colo.1993) (en banc); *Moore v. State Dep't of Transp.*, 875 P.2d 765, 774–75 (Alaska 1994) (Rabinowitz, J., dissenting).

---

**10.** The UPW's third argument on appeal is that Mayor Yamashiro privatized the landfill in order to punish the UPW for endorsing former Mayor Inouye in the 1992 primary election. The UPW argues that this allegation creates a genuine issue of material fact and that summary judgment is improper. Inasmuch as we have concluded that the County violated constitutionally mandated merit principles and civil service statutes, it is unnecessary for us to address this argument.

In the present dispute, there is no statute that expressly addresses privatization of public landfills. Although the County and WMI attempt to rely on HRS § 46–85, neither that statute nor its legislative history directly address the issue. In contrast, our statutes, and indeed our state constitution, strongly support the policies underlying the civil service. Because the only unequivocal support in our statutes is in favor of civil service policies, we must decide the present dispute in favor of civil service policies and against privatization.

We note that the legislature has expressly excluded many positions from civil service coverage in the past. For example, HRS § 76–16 is the equivalent of HRS § 76–77 for the state civil service. HRS § 76–16(13) expressly excludes positions held by prisoners from civil service coverage.[11] Thus, programs that involve prisoners providing services to the state[12] do not violate our civil service laws. HRS § 76–16(13) reflects a policy decision by our legislature—the policies behind prisoner work programs supersede the policies behind the civil service. In contrast to prisoner work programs, privatization does not have an express exclusion, and we believe that it would be improper for this court to usurp the legislature's role by making our own policy decision in favor of privatization.

The County and WMI argue that HRS § 76–77 is not applicable to the present dispute because, insofar as the contract at issue is with WMI, a corporation rather than an individual, it is not one for *"personal ser-vices."* (Emphasis added.) They further argue that the contract is for construction and operation of a landfill and not for "positions."

Thus, they assert, HRS § 76–77 does not apply.

We believe that the County and WMI fundamentally misconstrue HRS § 76–77. They apparently interpret the statute as requiring a formal employment contract between the government and the individual. They argue that because the contract in the present dispute was with WMI, rather than with individual workers, and because the contract was for construction and operation of a landfill, rather than for employment, the statute does not apply. However, nothing in the statute requires a formal employment contract. Instead, the statute defines "civil service" in terms of the nature of the positions and the services provided: "The civil service ... comprises all positions in the public service of each county, ... and embraces all personal services performed for each county[.]" In the present dispute, the "positions in the public service" are the landfill worker positions at Pu'uanahulu. The "personal services" are the services personally provided by the landfill workers, *i.e.*, the services associated with operation of a landfill. Thus, according to the plain meaning of HRS § 76–77, the statute applies to this dispute. Additionally, if HRS § 76–77 required a formal employment contract with the individual worker, the government could easily circumvent the statute by obtaining services through an intermediary corporation. The government could potentially take all public services outside the civil service system by contracting with corporations to provide services rather than directly hiring individual employees. The interpretation advocated by the County and WMI would render HRS § 76–77 a nullity.[13]

11. HRS § 76–16 (Supp.1996) provides in relevant part:
 **Civil service and exemptions.** The civil service to which this part applies shall comprise all positions in the State now existing or hereafter established and embrace all personal services performed for the State, except the following:
 . . . .
 (13) *Positions filled by inmates,* kokuas, patients of state institutions, persons with severe physical or mental handicaps participating in the work experience training programs, and students and positions filled through federally funded programs that

provide temporary public service employment such as the federal Comprehensive Employment and Training Act of 1973[.]
(Emphasis added.)

12. *See, e.g.,* HRS ch. 354D (Hawai'i Correctional Industries).

13. WMI further argues that applying HRS § 76–77 to this dispute would be inconsistent with the definition of "position" in HRS § 76–11(18) (1993), which provides: " 'Position' means a specific office or employment, whether occupied or vacant, consisting of a group of all the current duties and responsibilities assigned or delegated

The County and WMI further argue that invalidating the contract in the present dispute would violate the "home rule" provisions of the Hawai'i Constitution. Article VIII, section 2 states: "Charter provisions with respect to a political subdivision's executive, legislative and administrative structure and organization shall be superior to statutory provisions, subject to the authority of the legislature to enact general laws allocating and reallocating powers and functions." The County and WMI argue that section 13–13 of the Hawai'i County Charter,[14] which authorizes the County to enter into contracts with private parties, is therefore superior to state law. Thus, they maintain that invalidating the WMI contract based on state law would infringe upon "home rule."

However, in *City & County of Honolulu v. Ariyoshi*, 67 Haw. 412, 689 P.2d 757, *reconsideration denied*, 67 Haw. 682, 744 P.2d 779 (1984), we held that personnel matters, including civil service matters, are still subject to the control of the state legislature:

> From [our] review of the history of the adoption of the constitutional provision at hand, it is clear that the state legislature may enact general laws concerning state matters. Provisions of a charter or ordinance of a political subdivision of the state will be held superior to legislative enactments only if the charter provisions relate to a county government's executive, legislative or administrative structure and organization. Personnel matters, *including civil service and compensation matters,* remain subject to legislative control.

Id. at 420–21, 689 P.2d at 764 (emphasis added). *See also Hawaii Gov't Employees' Ass'n v. County of Maui*, 59 Haw. 65, 576 P.2d 1029 (1978). As discussed above, the present dispute involves civil service matters. We have held that the landfill worker positions in question are civil service positions. Therefore, state civil service statutes still govern the present dispute and article VIII, section 2 of the Hawai'i Constitution does not affect our decision.[15]

In conclusion, we hold that the County violated civil service statutes and the Hawai'i Constitution when it privatized the operation of the Pu'uanahulu landfill. The County was not entitled to judgment as a matter of law, and the circuit court erred in granting summary judgment in favor of the County. Instead, summary judgment should be granted in favor of the UPW. Although the UPW never filed its own motion for summary judgment, a court may enter judgment for the non-moving party on a motion for summary judgment where there is no genuine issue of material fact and the non-moving party is entitled to judgment as a matter of law. *Flint v. MacKenzie*, 53 Haw. 672, 501 P.2d 357 (1972) (per curiam). In the present case, the material facts are not in dispute and, in accordance with our discussion of the legal issues above, the UPW was entitled to judgment as a matter of law.

---

by competent authority, requiring the full or part-time employment of one person."

Initially, we note that HRS § 76–11 is located in HRS ch. 76, part II, and literally applies only to the civil service for the *state*. However, HRS § 76–78 makes the provisions of part II applicable to Hawai'i, Maui, and Kauai counties as well. Therefore, the definition of "position" in HRS § 76–11(18) does apply to HRS § 76–77. Nevertheless, this definition is not inconsistent with our analysis. The landfill worker positions in the present dispute are specific offices which require the full-time employment of one person, namely, a landfill worker. The "duties and responsibilities assigned or delegated by competent authority" are the duties associated with operating a landfill that are delegated to the worker by the County through the medium of the contract with WMI.

WMI argues that HRS § 76–11(18) requires "positions" to be created and funded by the government. In our view, the plain meaning of the statute does not support such a requirement. Indeed, as we have previously noted, such an interpretation would allow the government to avoid civil service coverage simply by reducing the size of their official payroll. This would render HRS § 76–77 a nullity, in violation of our rules of statutory construction.

14. Hawai'i County Charter § 13–13 provides in relevant part:

> **Contracts.** The county may enter into contracts with private parties, other counties, the state or the United States for the performance of any function or activity which the county is authorized to perform.

15. The County also argues that state collective bargaining laws give the County the right to enter into the contract with WMI. However, this issue is more appropriately discussed in Part II.B of this opinion.

Privatization may, or may not, be a worthy idea; we do not, and indeed should not, express an opinion in this regard. But if privatization is attempted by the government, it must be done in accordance with the laws of this state. The privatization effort of the County of Hawai'i simply did not comply with our laws.

B. *Whether the County Violated Collective Bargaining Laws (No. 18236)*

 In addition to claiming that the County violated civil service laws and merit principles, the UPW argues that the County violated state collective bargaining laws. Due to the procedural history of No. 18236, we apply the following standard of review to this portion of our opinion:

> Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. The standard of review is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91–14(g) to the agency's decision. This court's review is further qualified by the principle that the agency's decision carries a presumption of validity and appellant has the heavy burden of making a convincing showing that the decision is invalid because it is unjust and unreasonable in its consequences.

*Bragg v. State Farm Mutual Auto. Ins.*, 81 Hawai'i 302, 304, 916 P.2d 1203, 1205 (1996) (quoting *University of Hawai'i Professional Assembly v. Tomasu*, 79 Hawai'i 154, 157, 900 P.2d 161, 164 (1995)). HRS § 91–14(g) provides:

> Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> (1) In violation of constitutional or statutory provisions; or
>
> (2) In excess of the statutory authority or jurisdiction of the agency; or

> (3) Made upon unlawful procedure; or
>
> (4) Affected by other error of law; or
>
> (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

HRS § 91–14(g) (1993). "Under HRS § 91–14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects are reviewable under subsection (3); findings of fact are reviewable under subsection (5); and an agency's exercise of discretion is reviewable under subsection (6)." *Bragg*, 81 Hawai'i at 305, 916 P.2d at 1206.

On appeal, the only issue in dispute is the circuit court's reversal of the HLRB's decision as to Count IV of the amended complaint. The circuit court affirmed the HLRB's decision as to Counts I, II, and III, and the UPW does not challenge this aspect of the court's decision. Thus, the only question before us is whether the County was obligated to negotiate with the UPW over the effects of privatization and whether the County in fact refused to bargain after a request from the union.

The UPW argues that: (1) the circuit court should have deferred to the HLRB's expertise; (2) the decision to privatize is subject to mandatory bargaining; (3) the circuit court misconstrued the HLRB's ruling as an "effects bargaining" decision; and (4) contrary to the circuit court's factual finding, Mayor Yamashiro refused to negotiate with the UPW. The HLRB argues that the County's offer of September 2, 1993 to bargain over the effects of privatization was untimely, *i.e.*, the offer should have been made prior to the signing of the WMI contract. Because the offer was not made until after the County had entered into the contract, argues the HLRB, the County refused to bargain regarding the effects of privatization.

The County answers these arguments by essentially arguing that the circuit court's

decision was correct.[16] The County argues that, contrary to the UPW's assertion, the HLRB's decision does distinguish between decision bargaining and effects bargaining. The County further argues that the UPW requested only decision bargaining and never made a request to bargain over effects; in fact, the County's offer to bargain over effects on September 2, 1993 was never answered. The County also argues that, contrary to the HLRB's assertion, the County was not obligated to engage in effects bargaining before the contract was signed, but rather, could do so at any time before the effects occurred, *i.e.*, before the landfill opened. The County further argues that the appropriate remedy for refusal to conduct effects bargaining is money damages, not voiding the contract, because voiding the contract would essentially nullify the decision itself. The County additionally argues that the actual effects of the WMI contract are so minimal as not to require effects bargaining. Finally, the County argues that to decide this dispute on the issue of effects bargaining when the issue was neither pled nor litigated violates principles of due process.

 The parties raise a number of highly compelling arguments; however, we need not address any of them now because we decide this dispute on other grounds. Put succinctly, our disposition of No. 18203 in Part II.A. of this opinion largely dictates our disposition of No. 18236. In Part II.A., *supra*, we held that privatization of the landfill violates civil service statutes and constitutionally mandated merit principles. However, our collective bargaining statutes expressly state that parties are barred from negotiating upon and agreeing to proposals that violate merit principles. HRS § 89-9(d) (1993) provides in relevant part: "The employer and the exclusive representative [of the employees] shall not agree to any proposal which would be inconsistent with merit principles[.]" In the

present dispute, because the County's privatization effort violated civil service laws and merit principles, the County and the UPW were barred from bargaining over either the decision itself or its effects. It would be absurd for us to hold that the County violated collective bargaining laws by refusing to negotiate with the UPW when both parties were expressly barred from negotiating by statute.

Furthermore, in *State Organization of Police Officers (SHOPO) v. Society of Professional Journalists–University Chapter*, 83 Hawai'i 378, 927 P.2d 386 (1996), we held that

[t]he legislative history of HRS Chapter 89 ... indicates that the legislature intended to' mandate collective bargaining on terms and conditions of public employment, but that the scope of negotiable topics is tempered by an employer's public responsibilities.... [A] public employer's 'public responsibilities' must certainly include the duties imposed by ... duly enacted legislation[.]

*Id.* at 403, 927 P.2d at 411. In other words, collective bargaining statutes do not require negotiation over topics that are contrary to duly enacted laws. In the present dispute, as we held in Part II.A., *supra*, the County's privatization effort violated civil service statutes. Because the privatization effort was contrary to law, it was outside the scope of negotiable topics. Thus, under *SHOPO*, the County was not required to bargain over privatization.

Therefore, we hold that the County did not violate collective bargaining laws by refusing to bargain over the effects of privatization. The HLRB's conclusions of law stating that the County violated collective bargaining statutes are erroneous.[17] Thus, we affirm the judgment of the circuit court dismissing Count IV of the amended complaint, albeit for different reasons.[18]

---

16. WMI repeats many of these arguments.

17. The HLRB's conclusions of law state in relevant part:

The Employer wilfully refused to negotiate over the effects of its decision to privatize the West Hawaii landfill prior to the implementation of the decision and violated section 89-13(a)(5), HRS.

18. On appeal in No. 18326, WMI also challenges the circuit court's conclusion that the HLRB erred when it allowed WMI to intervene. It is unnecessary for us to address this issue. As noted above, the central issue in this appeal is our holding in No. 18203 that the County violated civil service laws and merit principles; our holding in No. 18236 is in fact dictated by our

We emphasize that this opinion should *not* be interpreted as establishing a per se rule that privatization is not subject to mandatory collective bargaining. Our decision on the collective bargaining issue is based on our prior holding that the County's privatization effort violated civil service laws and merit principles. If a future privatization effort does not violate civil service laws and merit principles, either because the County obtains certification under HRS § 76–77(7) or because the legislature enacts a new statute specifically exempting such privatization efforts, then it may indeed come into conflict with our collective bargaining laws. However, such circumstances are not before us at present.

### III. *CONCLUSION*

For the foregoing reasons, we hold that the County violated civil service laws and merit principles but did not violate collective bargaining laws. The contract between the County and WMI is void as a violation of public policy to the extent that it provides for the private operation of the Pu'uanahulu landfill. We vacate the circuit court's award of summary judgment in favor of the County in No. 18203 and remand for entry of summary judgment in favor of the UPW. We instruct the circuit court to grant the UPW a declaratory judgment. We further instruct the circuit court to fashion injunctive relief requiring the landfill to be transferred from private operation to County operation as rapidly as possible but consistent with practical and public interest concerns. The circuit court shall also monitor the transition and may impose sanctions for non–compliance. Finally, the circuit court is to determine whether the additional relief requested by the UPW is appropriate. We affirm the circuit court's judgment in No. 18236.

### MOTION FOR RECONSIDERATION AND ORDER OF AMENDMENT

We take this opportunity to reassert the central meaning of our decision. Privatization involves two important, but potentially conflicting policy concerns. On the one hand, privatization purportedly can improve the efficiency of public services. On the other hand, privatization can interfere with the policies underlying the civil service as set forth by the legislature, *i.e.*, elimination of the spoils system and the encouragement of openness, merit, and independence. In the absence of clear legislative support for privatization, we must interpret the laws as they currently exist. Our statutes, and indeed our constitution, reflect strong support for the policies underlying the civil service. As a court, our decisions relating to disputes governed by the application of statutory law (and not otherwise implicating constitutional principles) must be based on that statutory law as it currently exists, and not on statutory law as it could be or even as it should be. The determination of what that law could be or should be is one that is properly left to the people, through their elected legislative representatives.

In their motions for reconsideration, the County and WMI raise a number of arguments, most of which are meritless. However, they also raise various practical concerns. The County and WMI argue that the transition from private operation to County operation will take time and that it could result in detrimental public health and environmental effects. The County attached two affidavits and a newspaper editorial in support of its motion. In its answer to the motion, the UPW strongly contests the County's and WMI's assertions.

At this point, we have an insufficient basis to determine the validity of the respective arguments raised by the County/WMI and the UPW. We cannot consider the material attached to the County's motion because that material is not part of the record on appeal. *See Orso v. City & County of Honolulu,* 55 Haw. 37, 514 P.2d 859 (1973); Hawai'i Rules of Appellate Procedure Rule 10(a). Therefore, the practical impact of the transition from private operation to County operation is a matter more appropriate for the circuit

---

prior holding in No. 18203. Inasmuch as the circuit court allowed WMI to intervene in No. 18203, it makes little difference whether WMI

should have been allowed to intervene in No. 18236 as well.

court to address on remand. Consequently, we modify our decision to allow the circuit court to consider the practical concerns of the parties.

For the reasons stated above, the County's and WMI's motions for reconsideration, both filed on March 17, 1997, are granted in part.