[No. 5755-7-II.   Division Two.   April 6, 1983.]

WILLIAM KEETON, ET AL, *Respondents*, v. THE DEPART-
MENT OF SOCIAL AND HEALTH SERVICES,
ET AL, *Appellants*.

*Kenneth O. Eikenberry, Attorney General,* and *Charlotte Hardnett, Assistant,* for appellants.

*Cordes, Cordes & Younglove* and *Clifford F. Cordes III,* for respondents.

PETRIE, J.—Defendants, Department of Social and Health Services, its Secretary, Lakeland Village, and its Superintendent, appeal from a summary judgment in favor of plaintiffs, William Keeton, Laurel Tobler, and Washing-

ton Federation of State Employees, AFL–CIO, Council 28, granted upon the parties' cross motions. Hereafter we treat all defendants in the singular, as DSHS. We reverse and render summary judgment for DSHS after finding that neither the State Civil Service Law nor the parties' collective bargaining agreement was contravened by DSHS's actions.

DSHS operates Lakeland Village, a residential facility whose sole function is to care for and provide services to persons who are developmentally disabled. Since its establishment in 1915 it has employed bakers to prepare bakery goods at the facility for consumption by the residents.

As early as the 1950's the resident population of the Village began to decline steadily. The population in 1952 was 1,449 residents. This number gradually and unceasingly decreased each year. In 1977 resident population was 625, and in 1981 only 420 persons resided there under the State's care.

Due to the State's financial deficits, DSHS was forced to reduce its expenditures in 1980. After conducting a study to determine how best to cut costs and still maintain essential services to the residents, DSHS decided that the two baker positions at the facility would be eliminated. As early as 1977 DSHS had determined that it was not cost effective to prepare baked goods on–site rather than purchase the ready–made product from the open market with a resident population of only 550.[1] When the population dropped below that figure, continued preparation of cake, bread, and donuts by in–house bakers became financially imprudent.

The budget deficit in 1980 proved to be the catalyst which sparked DSHS to deal with this financially imprudent operation. In accordance with State procedures for

---

[1] In 1977 the design plan for the new Lakeland Village food service facility, scheduled for completion in 1982, did not even include a bakery because the declining resident population was expected to continue until it dropped to 350— the minimum population necessary to maintain federal funding to the State. Because the resident population must be at least 550 to keep the bakery from operating in the "red", it was unlikely that continued operation of the bakery would ever again become financially prudent.

reduction in force (RIF), WAC 356–30–330, plaintiff bakers, Keeton and Tobler, were notified of their termination and offered similar employment positions elsewhere. On behalf of DSHS, and pursuant to RCW 43.19.190(2),[2] the Department of General Administration entered into a contract with ITT Continental Baking Company to purchase commercially prepared bakery products for the residents of Lakeland Village.

Thereafter in September 1980 plaintiffs filed this action seeking permanent injunctive relief from defendant's decision to abolish these two civil service positions and instead purchase bakery goods on the open market. Plaintiffs argued that these actions by DSHS violated both the strictures of *Washington Fed'n of State Employees Coun. 28 v. Spokane Comm'ty College*, 90 Wn.2d 698, 585 P.2d 474 (1978) and the State Civil Service Law, RCW 41.06.380, which limits the State's right to purchase services by contract in certain situations. Additionally, plaintiffs charged that defendant's actions breached article XII of the parties' collective bargaining agreement, which prohibits management from contracting out work when the effect of such actions is to eliminate positions or preclude performance of such work by civil service personnel.

## I

Long ago the general principle of law was established in Washington that a public agency is vested with the managerial discretion to abolish civil service positions and terminate the civil servant. *State ex rel. Burris v. Seattle*, 82 Wash. 464, 144 P. 695 (1914). Indeed, no civil servant has an absolute and inherent right to work at a particular job. *See Cunningham v. Community College Dist. 3*, 79 Wn.2d 793, 804, 489 P.2d 891 (1971). To hold otherwise would effectively paralyze any lawful efforts by the State to take advantage of technological and labor–saving advancements

---

[2]RCW 43.19.190(2) allows the director of general administration to purchase "all material, supplies, services, and equipment needed for the support, maintenance, and use of all state institutions, . . ."

which, if implemented, could realize greater efficiency and cost savings to the taxpaying public.

This broad principle is not without significant limitations. While the State Personnel Board is expressly granted the right to lay off and reduce the number of employees,[3] it must do so within established procedures provided by WAC 356-30-330. The predominant thrust of this regulation is aimed at alleviating the harsh effects upon employees, through safeguards such as seniority, bumping, and options in lieu of separation, when reduction occurs. Consequently, a state agency's initial decision to reduce its work force is circumscribed by subsection 1 of that regulation which states:

> (1) Employees may be separated in accordance with the statutes and the agencies' approved reduction–in–force procedures after fifteen calendar days' notice in writing, without prejudice, because of lack of funds or curtailment of work, or good faith reorganization for efficiency purposes.

In order to abolish positions, the State must show that "lack of funds or curtailment of work, or good faith reorganization for efficiency purposes" motivated its action. Such a showing cannot be based upon mere speculation. *Cunningham v. Community College Dist. 3, supra.* Plaintiffs do not challenge the State's motives here.

There exists yet another judicially created protection afforded State civil servants when their employer seeks to effectuate cost–saving measures. In *Washington Fed'n of State Employees Coun. 28 v. Spokane Comm'ty College, supra,* the college awarded a contract for janitorial services for its new buildings to an independent contractor rather

---

[3]Former RCW 41.06.150 states in pertinent part:

"The board shall adopt rules, consistent with the purposes and provisions of this chapter, as now or hereafter amended, and with the best standards of personnel administration, regarding the basis and procedures to be followed for:

"(1) The reduction, dismissal, suspension, or demotion of an employee;

". . .

"(10) Layoffs when necessary and subsequent reemployment, both according to seniority;"

than increase and utilize its complement of civil service personnel which had customarily been responsible for such services to the college. In spite of undisputed cost savings to the college and the fact that such action would not operate to terminate any civil service positions or employees, the Supreme Court held that the employer's action in that situation was contrary to the policy underlying the merit system established by the State Higher Education Personnel Law.[4]

However, we find *Spokane* inapposite to the instant case. The facts in *Spokane* involved the contracting out of work in the nature of personal services which was to be accomplished under substantially the same conditions and in the same manner as those historically provided by civil servants. The college was expanding its operation but refusing to expand its use of civil servants. In the case at bench, the State is not contracting out services.

The term "contracting out" is intrinsically imprecise and is considered a term of art. Dowling, *State Civil Service Law—Civil Service Restrictions on Contracting Out by State Agencies—Washington Federation of State Employees v. Spokane Community College, 90 Wn. 2d 698, 585 P.2d 474 (1978),* 55 Wash. L. Rev. 419, 419 n.3 (1980). A basic, workable definition is found in *Fibreboard Paper Prods. Corp. v. NLRB,* 379 U.S. 203, 215, 13 L. Ed. 2d 233, 85 S. Ct. 398, 6 A.L.R.3d 1130 (1964), *i.e.,* "the replacement of employees in the existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment". Cases arising under the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.,* are instructive and support the notion that "contracting out" connotes the rendering of personal services. *See, e.g., Fibreboard Paper Prods. Corp. v. NLRB, supra* (mainte-

---

[4]Although *Spokane* was decided under RCW 28B.16.010, we find the State Civil Service Law, RCW 41.06.010 *et seq.,* sufficiently similar in history, purpose and intent; accordingly, we are bound by its strictures; *compare* RCW 28B.16.010 *with* RCW 41.06.010.

nance work); *NLRB v. Brown–Dunkin Co.,* 287 F.2d 17 (10th Cir. 1961) (janitorial services); *NLRB v. Transmarine Nav. Corp.,* 380 F.2d 933 (9th Cir. 1967) (guard services).

In the case at bench, however, DSHS is abolishing completely one aspect of its operation, that of baking bread on–site for consumption by the residents at Lakeland Village. Although the final product (bakery goods) is to be retained, the State is simply purchasing these goods, not services, from the open market. Thus, the actions of DSHS in the instant case in eliminating one aspect of its operations are somewhat analogous to cases arising under the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.,* which involve a partial closing of one's business. *See, e.g., NLRB v. Adams Dairy, Inc.,* 350 F.2d 108 (8th Cir. 1965). Cases under federal labor law have consistently recognized the legal difference between contracting out and going out of business. 2 J. Jenkins, *Labor Law* § 7.75 (1974). That difference is vital in the case at bench. DSHS is simply not replacing civil service employees with other employees under similar working conditions. *Spokane* does not support plaintiffs' assertions.

Plaintiffs assert additionally, that defendant's actions are contrary to RCW 41.06.380, which states:

*Purchasing services by contract not prohibited— Limitations.* Nothing contained in this chapter shall prohibit any department, as defined in RCW 41.06.020, from *purchasing services* by contract with individuals or business entities if such services were regularly purchased by valid contract by such department prior to April 23, 1979: *Provided,* That *no such contract may be executed or renewed if it would have the effect of terminating classified employees* or classified employee positions existing at the time of the execution or renewal of the contract.

(Italics ours.) Specifically, plaintiffs contend DSHS's proposed actions violate the proviso clause of this statute. However, we find this amendment to the State Civil Service Law inapplicable to the case at bench. The apparent thrust of this 1979 statutory amendment to the State's civil serv-

ice law is to "grandfather" State contracts for services which existed prior to the decision in *Spokane*. The timing of the enactment of this amendment suggests that it is a limited legislative response to the decision in *Spokane* due to legislative concerns that existing contracts in which the State contracted out for personal services, as in *Spokane,* might be held invalid without such a measure. *See* Dowling, *State Civil Service Law—Civil Service Restrictions on Contracting Out by State Agencies—Washington Federation of State Employees v. Spokane Community College, 90 Wn. 2d 698, 585 P.2d 474 (1978),* 55 Wash. L. Rev. 419, 422 (1980). The entire amendment, including its proviso, is simply not applicable to the case at bench because, as already indicated, the State is simply purchasing goods; it is not "purchasing services."

## II

Although the State has the power to abolish civil service positions in good faith for reasons of economy, limited by the judicial and legislative constraints noted herein, the State may still relinquish or constrict such managerial prerogatives through a collective bargaining agreement. Plaintiffs argue that DSHS has done so in article XII of the parties' collective bargaining agreement which states:

> *Contracting Out.* Management retains those rights based upon law or State rules and regulations to contract and sub-contract work. Management will not, however, contract or sub-contract work when such action will cause the elimination of classified positions or preclude the performance of work typically and historically accomplished by civil service personnel within the institution.

██ Interpretation of a public employment collective bargaining agreement is governed by the law of contracts. *Barclay v. Spokane,* 83 Wn.2d 698, 521 P.2d 937 (1974); *Tondevold v. Blaine Sch. Dist. 503,* 91 Wn.2d 632, 590 P.2d 1268 (1979). As such, the agreement is susceptible to certain well known canons of construction. First and foremost is the rule that "words and phrases are to be taken in their general and ordinarily accepted meaning and connotation"

unless otherwise defined by the parties or by the dictates of the context. 1 B. Werne, *Public Employment Labor Relations* § 16.1, at 280 (1974). *See, e.g., General Tel. Co. of Northwest, Inc. v. C–3 Assocs.*, 32 Wn. App. 550, 648 P.2d 491 (1982). The Restatement (Second) of Contracts § 202 (1981) requires that "technical terms and words of art" be given "their technical meaning" when used in an agreement within that field or context. Additionally, where a general provision precedes specific exceptions or qualifications to the general proposition, both are given effect with the exceptions limited to those specifically delineated, unless indicated otherwise. 1 B. Werne, *Public Employment Labor Relations* § 16.1; *see, e.g.,* Restatement (Second) of Contracts § 203(a), comment *e* (1981).

Article XII broadly preserves those managerial rights allowed by law to contract and subcontract work, and immediately thereafter limits those rights by precluding contracting or subcontracting out "work" when the effect is elimination of positions or prevention of performance of work historically performed by civil servants. The foregoing principles of contract interpretation do not defeat the actions of DSHS in this case. As noted earlier in this opinion, "contracting out" is a technical term which has evolved in the context of labor relations. More specifically, in cases arising under the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.,* "contracting out work" and "contracting out services" have been used interchangeably in the field. *See, e.g., Fibreboard Paper Prods. Corp. v. NLRB, supra.* Although the actions of DSHS in abolishing these two baker positions certainly operated to preclude the performance of work typically and historically accomplished by civil service personnel within the institution, we do not find that DSHS's actions in replacing the work product of the bakers by the purchase of a commercially baked good sold to the public on the open market comes within the technical meaning of "contracting out work" as used in the area of labor relations.

In conclusion, we reverse the summary judgment entered

in favor of the plaintiffs. There is neither a dispute of material fact or inference therefrom, nor any ambiguity in the collective bargaining agreement. Accordingly, DSHS's motion for summary judgment should be, and it is, granted as a matter of law.

PETRICH, C.J., and REED, J., concur.

Reconsideration denied May 10, 1983.

Review denied by Supreme Court June 17, 1983.