[Nos. 32599-0-I; 32990-1-I.   Division One.   October 17, 1994.]

JOINT CRAFTS COUNCIL AND TEAMSTERS UNION LOCAL
117, *Respondent*, v. KING COUNTY, *Appellant*.

*Norm Maleng, Prosecuting Attorney*, and *Maureen Madion, Kristofer Bundy*, and *Cheryl Diane Carlson, Deputies*, for appellant.

*Spencer N. Thal* and *Schwerin, Burns, Campbell & French*, for respondent.

GROSSE, J. — King County appeals the summary judgment in favor of Joint Crafts Council and Teamsters Union Local 117 (hereafter collectively JCC) in JCC's action seeking to hold the County liable for violating civil service merit

principles by contracting with private entities for maintenance and repair services on police vehicles used in the County's "Car Per Officer" program. We reverse, finding that the use of private entities under the circumstances presented does not violate the County's civil service system.[1]

Joint Crafts Council and Teamsters Union Local 117 are bargaining units for employees of King County who repair and maintain county vehicles. These employees are also members of King County's personnel system. Pursuant to King County Charter § 510 and King County Code 3.12.050, this personnel system bases the recruitment, selection, and retention of employees on merit.

Prior to the fall of 1987, JCC provided maintenance and repair services to vehicles used by members of the County's police force at a centralized facility in Seattle. County police officers shared a limited number of police vehicles. The officers provided their own transportation to their precinct, where they would be assigned an available vehicle.

In the fall of 1987, the County instituted a "Car Per Officer" program (CPO program) under which each officer was provided his or her own police vehicle. Each officer not only uses the vehicle while on duty, but also keeps it at home and drives it to and from his or her assigned precinct. Under the CPO program, the officers can obtain vehicle maintenance and repair service for their vehicles while on duty. These services are provided by private entities located closer to the homes and precincts of the individual officers than is the County's centralized facility.

No county employee has lost his or her job because of the CPO program, although JCC submitted evidence that the hours worked by private entities on vehicles involved in the CPO program in 1991 amounted to the equivalent of 6.09 full-time positions. The county motor pool supervisor stated that if the County had been repairing and maintaining vehi-

---

[1]Because we reverse the summary judgment entered in favor of JCC, we need not address JCC's appeal of the summary judgment in favor of the County on JCC's claim for back pay and attorney fees, and denial of JCC's claim for injunctive relief.

cles used in the CPO program, he would have eventually sought authority to hire two more employees to handle the additional work generated by the increased number of police vehicles in the fleet. He also stated that existing motor pool employees would not have been forced to work overtime.

In June 1991, JCC filed an action against King County alleging that it violated the County's civil service merit system by contracting with private entities for vehicle maintenance and repair services. The trial court granted JCC's motion for partial summary judgment on liability and found no just reason for delay in the entry of a judgment of liability. The trial court also granted the County's motion for summary judgment on JCC's claim for back pay and attorney fees and denied JCC's claim for injunctive relief. Both the County and JCC appeal.

King County's charter directs the County to develop

> an effective personnel system for the county which will assure: recruitment, selection and retention of county employees on the basis of merit; the development of a county career service; promotion on the basis of demonstrated ability; and compensation and personnel practices which will keep the county system competitive.

King County Charter § 510.

The King County Code (KCC) provides: "All career service employees shall be members of the county career service mandated by Section 510 of the Charter. The recruitment, selection and promotion of such employees shall be competitive and shall be based on merit and demonstrated ability." KCC 3.12.050.

JCC contends that the County's use of private entities to repair and maintain police vehicles used in the CPO program violates the civil service merit system established by the foregoing provisions of the charter and ordinance. We disagree.

The record shows that, prior to the CPO program, civil servants customarily and historically performed maintenance and repair services on county police vehicles. Accordingly, where a new need for these services arises, civil ser-

vice principles require that they be provided by civil servants rather than private entities, unless there is a "showing that civil servants could not provide those services". *Washington Fed'n of State Employees Coun. 28 v. Spokane Comm'ty College*, 90 Wn.2d 698, 702-03, 585 P.2d 474 (1978). Real or anticipated cost savings from the use of private entities is not sufficient to show that civil servants cannot provide the services. *Spokane*, 90 Wn.2d at 703. However, a showing that it is not practicable for civil servants to provide the necessary services is sufficient to permit the use of private entities. *Spokane*, 90 Wn.2d at 703 (quoting H. Eliot Kaplan, *Civil Service* 98-99 (1958)).

The record in the instant case shows that the decision to use private entities was not made on the basis of real or anticipated cost savings. In fact, the record contains evidence that, at least initially, the costs of vehicle maintenance and repair under the CPO program exceeded those costs under the centralized maintenance system.

Because cost savings was not the basis of the decision to cease using civil servants, the County's use of private entities to repair and maintain officers' vehicles does not violate the civil service merit system if, upon implementation of the CPO program, it was no longer practicable for civil servants to work on police vehicles. We find that it was not practicable.

The record shows that the CPO program was not arbitrary, capricious, or instituted in bad faith or with the intent of avoiding civil service merit principles. The County implemented the CPO program after researching similar programs in other jurisdictions and after concluding that a CPO program would:

> (1) improve scheduling efficiency; (2) heighten officer morale and pride in the profession; (3) provide for enhanced police visibility to deter crime; (4) financially benefit [the] officers while providing the Department with an effective disciplinary tool; (5) encourage interaction between citizens and [County] police officers; (6) increase the life of the cars from one year (with no resale value) to roughly seven years (with resale value); and (7) result in greater overall field coverage and accountability for vehicle damage.

The record shows that since the inception of the CPO program, the average time for a King County patrol officer to respond to a report of a crime or an emergency call has decreased. The most notable decrease in response time has been during shift changes when, prior to the CPO program, officers were often delayed at the precinct until a vehicle became available. The CPO program has also increased the police department's ability to quickly and fully activate its forces to respond to emergency situations such as natural disasters or riots.

The record also shows that decentralized maintenance of vehicles used in the CPO program is fundamental to the program's success. Permitting officers to service their vehicles at locations closer to their precincts than the County's downtown Seattle facility maximizes the availability of police officers to serve the public and minimizes the addition of unnecessary mileage to police vehicles incurred by traveling to and from the centralized maintenance facility.[2] In light of the purposes and goals of the CPO program, we hold that, upon implementation of the CPO program, it was no longer practicable, from other than a strictly cost savings perspective, for civil servants to continue to perform maintenance and repair services on police vehicles.

We find support for our holding in *Keeton v. Department of Social & Health Servs.*, 34 Wn. App. 353, 661 P.2d 982, *review denied*, 99 Wn.2d 1022 (1983). There, as in the instant case, the governmental agency determined that it would no longer be practicable to continue to have public employees do certain work, and discontinued an aspect of its operation. Unlike in

---

[2]King County councilmember Sims stated in an affidavit: "The concept of servicing all of our police vehicles at a central site is outdated. A return to centralized maintenance would frustrate every goal of the County's Car Per Officer program. Rather than patrolling the streets, our officers would be paid to transport their vehicles back and forth to a central shop for maintenance. Rather than keeping the cars in the communities where they belong, police vehicles would be unnecessarily 'tied up.' Moreover, the vehicles would suffer unnecessary wear and tear and increased mileage. To operate a central maintenance shop would require the purchase of several more vehicles just to stock a pool. . . . Because the officer feels that the vehicle is his or her own, our vehicles have been better maintained and preserved."

*Spokane*, both in *Keeton* and the instant case, the governmental agency did not simply replace civil servants with private workers to work under the same working conditions. Rather, the agency closed part of its operation because it was no longer practicable to continue it. In *Keeton*, it became no longer practicable for the Department of Social and Health Services to employ bakers at a home for the developmentally disabled because of the drastic decline in the number of residents at the facility. Instead, the Department of Social and Health Services utilized the services of private bakers by purchasing baked goods for the facility on the open market. The court upheld the agency's decision to discontinue an aspect of its operation, finding no violation of the civil service system. Likewise, in the instant case, the discontinuance of the practice of repairing and maintaining police vehicles at the County's centralized facility was necessitated by the implementation of the CPO program, which rendered continued use of the centralized facility for the repair and maintenance of police vehicles no longer practicable.

The summary judgment in favor of JCC is reversed. We remand to the trial court with instructions to enter summary judgment in favor of the County.

PEKELIS, C.J., and AGID, J., concur.