**FILED**
**JULY 6, 2017**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 33935-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DALE EUGENE WILSON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, C.J. — Dale Wilson challenges his conviction for first degree rape of a

child and his sentence that imposes legal financial obligations (LFOs). We affirm his

conviction, but remand to the trial court to conduct an individualized inquiry into

Wilson's ability to pay discretionary legal financial obligations.

## FACTS

This prosecution arises from contact between Dale Wilson, a Bellingham resident,

and a minor girl, Betty Lewis, an East Wenatchee denizen. Dale Wilson was the

boyfriend of Laurie Lund, the custodian of Betty. Betty Lewis is a pseudonym.

Betty Lewis was born on October 7, 2005. After her mother died in 2009, she and

her brother lived with their aunt, Laurie Lund, in East Wenatchee. Betty was four and

Betty's brother was seven when they came to live with Lund. Lund began dating Dale Wilson in October 2012.

Upon the commencement of their relationship in October 2012, Dale Wilson visited Laurie Lund in East Wenatchee most weekends. When Wilson visited, Lund occasionally left him alone with Betty and her brother. Lund worked at an orchard from June to October 2013. On some occasions, when Lund worked, the two children stayed home alone with Wilson.

Dale Wilson and Laurie Lund vacationed in Canada from June 4 to June 21, 2014. In the couple's absence, Betty Lewis and her brother resided with Lund's sister, Julie Bowers, in Odessa. While in Odessa, Betty and her teenage cousin visited a park where Betty asked the cousin if she could hold a secret. Betty then disclosed that Dale Wilson taught her about sex, including the act of a man placing his penis in the three main female holes. When mentioning holes, Betty pointed to her mouth, buttocks, and vagina. Betty told her cousin about sexual contact with Wilson. She informed her cousin that she disclosed the information because she considered Wilson's conduct to be wrong and she could not keep the conduct a secret anymore. The sexual contact happened when she was in the second or third grade.

The teenage cousin escorted Betty to the cousin's home. The cousin ushered Betty into her mother's room and told Betty to repeat to Aunt Julie what Betty told her. Betty repeated her story to Julie Bowers. On a later day, Bowers asked Betty to repeat the

2

description of Dale Wilson's conduct, and Betty recounted the narrative in the same order. Betty added that a man squirted, but Wilson did not squirt in or on her.

On June 21, Dale Wilson and Laurie Lund retrieved Betty and her older brother from Julie Bowers. Bowers then informed Lund about sexual contact between Betty and Wilson. Lund and Wilson, with the two children, returned to East Wenatchee. Lund did not talk about Betty's allegations between June 21 and 24, when Wilson returned to his home in Bellingham.

On June 25, Laurie Lund spoke to Betty about what Betty told Betty's Aunt Julie. Betty responded that Wilson taught her about sex, inserted his penis in her mouth, and demonstrated how men squirt. Wilson warned Betty that, if she informed anyone about his conduct, no one would believe her, and she would undergo a spanking. Betty declared that Wilson performed sex acts with Lund absent from the home. Wilson showed her videos of women sucking men's penises.

Days later Laurie Lund telephoned Dale Wilson and confronted him with Betty Lewis' disclosures. Wilson denied Betty's accusations. He expressed shock and listed reasons for Betty fabricating her stories. Wilson alleged that Betty's grandfather, John Royce, performed sex acts on her and someone else spoke to Betty about sex. Royce had attempted years earlier to sexually abuse his daughter, Laurie Lund. Royce lived in Tonasket, where Betty formerly lived, but he last saw Betty in 2011. John Royce is also a pseudonym.

Laurie Lund reported the sexual conduct of Dale Wilson toward Betty Lewis to law enforcement. On June 27, 2014, East Wenatchee Police Detective Darrin Darnell investigated the allegations. Darnell searched for DNA and semen on the bathroom counter, where Wilson allegedly ejaculated, and for pornographic videos on the computer laptops of Lund and Wilson. Detective Darnell discovered no DNA, semen, or explicit videos.

Detective Darrin Darnell interviewed Betty Lewis in the presence of Laurie Lund. Betty attended second grade and was eight years old at the time of the June interview. Betty disclosed that Wilson described sex to her and the portrayals included boy's use of their penises around girls. Betty added that Wilson showed her videos showing naked people. Betty insisted she did not fabricate her report to punish Wilson. Throughout the interview, Betty's account remained consistent. The detective also interviewed Betty's cousin and Julie Bowers.

## PROCEDURE

The State of Washington charged Dale Wilson with one count of first degree rape of a child. He stipulated to the admissibility of child hearsay statements in exchange for the State's recommendation, if the jury convicted, of a low-end standard range sentence of ninety-three months.

At the outset of voir dire, the court asked the jury panel several general questions, the second being, "[h]ave you, a close friend or relative had experience with a similar or

4

related type of case or incident?" Report of Proceedings (RP) (Oct. 7, 2015 - voir dire) at 10. If a juror raised his or her card, the judge further asked: "would that affect your ability to be fair and impartial?" RP (Oct. 7, 2015 - voir dire) at 10. Several panel members raised a card. The first two jurors lifting a card rendered equivocal answers, and the trial court informed the jurors that attorneys would inquire further.

Juror 31, the third to be addressed by the judge, disclosed that she "was molested as a child—and I would—I can't say that it would affect my decision or, or not, but, so . . ." RP (Oct. 7, 2015 - voir dire) at 11. The next juror 33, indicated that, as a victim of rape who suffers from posttraumatic stress disorder, he would not be fair and impartial. At defense counsel's request, the trial court excused juror 33 from jury service.

Later during voir dire, defense counsel questioned juror 31 and asked if she could be fair and impartial despite her childhood experience. Juror 31 answered, "I believe I can be fair and impartial." RP (Oct. 7, 2015 - voir dire) at 66. Defense counsel continued his questioning of juror 31 at length. Juror 31 agreed with counsel that first "perception isn't always accurate." RP (Oct. 7, 2015 - voir dire) at 68.

The trial court excused nine jurors for cause because each indicated he or she could not be fair and impartial due to the nature of the allegations or his or her personal experience with sexual abuse. The court excused six venire people before the questioning of juror 31 and three after the questioning. The trial court excused juror 33 because of posttraumatic stress disorder from sexual molestation as a child; Juror 41

5

because of the sexual molestation of her daughters; juror 8 because of an emotional reaction during questioning; juror 20 because of an inability to listen to graphic evidence; juror 2 because of being an incest survivor and therapist for child sexual assault victims; juror 42 because his fiancé's son suffered molestation; juror 13 because he formed an opinion and made a judgment of Dale Wilson during voir dire; and juror 28 because of his predilection to believe the child's accusations before hearing the evidence. The trial court also excused two additional panel members for other reasons: juror 22 because of a family member's health situation; and juror 1 because of his strong slant in favor of law enforcement officers. Defense counsel neither challenged juror 31 for cause, nor exercised a preemptory challenge to remove juror 31.

During trial, Betty Lewis testified that Dale Wilson came to her family house and made her suck his penis more than once. Wilson testified in his own defense. He stated he learned of Betty's allegations on June 25, 2014. Wilson testified he did not stick his penis in Betty's mouth or otherwise molest her.

The jury convicted Dale Wilson as charged. At the sentencing hearing, the State recommended legal financial obligations, and Wilson registered no objection. The trial court imposed the recommended obligations of a $500.00 victim assessment, $846.10 in court costs, $500.00 for FCM/MTH, and a DNA collection fee of $100.00. The court costs included a $200.00 criminal filing fee, $396.10 in witness costs, and a $250.00 jury demand fee. The court set monthly payments at $25.00.

6

In the discussion about the defense's expert witness costs, defense counsel stated:

> I'm guessing it's somewhere around 1,500 bucks, somewhere around there, and if the Court wants to assess that along with the rest of the legal financial obligations, Mr. Wilson's presumably going to be incarcerated for quite some time and wouldn't be able to start making payments on any of that until he got out.

RP (Nov. 30, 2015) at 494. The trial court discussed language in the judgment and sentence that required Wilson to pay the costs of polygraph exams. The court commented that the legislature will enact a bill to abolish legal financial obligations, and so the sentencing court did not require payment of the costs of polygraph examinations. As to payment of assessed financial obligations, the trial court commented:

> Obviously while you're in prison if you work, they'll send me a $1.43 or something to that effect, so we won't violate you for not paying while you're in prison. Once you get out of prison, then we'll take a look at your finances at that time.

RP (Nov. 30, 2015) at 503.

Dale Wilson, on his counsel's advice, did not allocute. The court sentenced him within the standard range to a minimum term of ninety-three months and a maximum of life.

## LAW AND ANALYSIS

*Issue 1: Did Dale Wilson receive ineffective assistance of counsel when his trial counsel did not challenge juror 31 for cause, after the juror disclosed she was molested*

7

*as a child, could not answer whether her childhood decision would impact her, and declared that her initial gut feeling about the child rape case was poor?*

*Answer 1: No.*

Dale Wilson contends that his trial counsel was ineffective because counsel failed to object to the seating of juror 31, who had been molested as a child. The State responds that Wilson's counsel did not provide ineffective assistance because juror 31was rehabilitated and said that she could be impartial. The State emphasizes that trial counsel removed nine other jurors who indicated that they could not be impartial. We agree with the State.

The Sixth Amendment to the United States Constitution guarantees defendants the right to legal counsel in criminal trials. Like the federal constitution, Washington's Constitution also grants an accused, in a criminal prosecution, the right to appear by counsel. CONST. art. I, § 22. The right to counsel under the state and federal constitutions are coextensive. *State v. Long*, 104 Wn.2d 285, 288, 705 P.2d 245 (1985).

To meaningfully protect an accused's right to counsel, an accused is entitled to "effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Courts apply a two-pronged test to determine if counsel provided effective assistance: (1) whether counsel performed deficiently, and (2) whether the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. at 690-92. If a defendant fails to establish one prong of the test, this court need not

8

address the remaining prong. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). This is a mixed question of law and fact, reviewed de novo. *Strickland v. Washington*, 466 U.S. at 698. We address only the first prong.

To satisfy the first prong, the defendant must show that, after considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). The burden is on the defendant to show deficient performance. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). This court gives great deference to trial counsel's performance and begins the analysis with a strong presumption counsel performed effectively. *State v. West*, 185 Wn. App. 625, 638, 344 P.3d 1233 (2015). Trial strategy and tactics cannot form the basis of a finding of deficient performance. *State v. Johnston*, 143 Wn. App. 1, 16, 177 P.3d 1127 (2007).

The decision of whether to keep a prospective juror on the jury panel or whether to dismiss a juror often is based on the trial counsel's experience, intuition, strategy, and discretion. *State v. Lawler*, 194 Wn. App. 275, 285, 374 P.3d 278, *review denied*, 186 Wn.2d 1020, 383 P.3d 1027 (2016). A jury pool is determined at random and represents a cross-section of the various demographics contained within an area. Therefore, while one aspect of a juror might suggest exercising a preemptory challenge or challenge for cause, another aspect might counter or override this aspect. On appeal, the court can only look at the words on the record. Nevertheless, a lawyer may keep someone on the jury

9

panel despite his voir dire responses because of his background, other personal characteristics, mannerisms, or nonverbal communication. *State v. Lawler*, 194 Wn. App. at 290. Another tactical consideration that does not appear on the record is who the next juror in line would be should the lawyer remove the juror in question. *State v. Lawler*, 194 Wn. App. at 290.

A juror's equivocal answers during voir dire does not mean that she should be challenged for cause. The appropriate question is whether a juror with preconceived ideas can set them aside and decide the case on an impartial basis. *State v. Grenning*, 142 Wn. App. 518, 540, 174 P.3d 706 (2008), *aff'd*, 169 Wn.2d 47, 234 P.3d 169 (2010). In this appeal, juror 31 stated that she believed she could be fair and impartial when questioned by defense counsel. In further discussion with defense counsel, the juror at issue acknowledged that first impressions were not always correct.

Dale Wilson suggests ongoing bias by juror 31 because jury deliberations took an hour. Nevertheless, as illustrated by defense counsel's other challenges for cause, counsel aggressively sought removal of potential jurors who exhibited emotional reactions or other biases. The trial court similarly had the duty to excuse a juror on its own motion if it deemed a potential juror biased. RCW 2.36.110. Both defense counsel and the trial court, who were in the position of this reviewing court to determine if juror 31 spoke honestly, concluded that juror 31 would be fair and impartial.

Dale Wilson may complain about counsel's performance when rehabilitating juror 31 rather than immediately moving for her dismissal as a juror. Nevertheless, Wilson fails to establish that rehabilitating the juror rather than removing her possessed no conceivable tactical purpose, such as preventing other less suitable jurors from being seated. The rehabilitation also may have encouraged others to keep an open mind and to recognize the need to thoughtfully decide after hearing all the evidence. Therefore, the first prong of *Strickland* fails.

*Issue 2: Whether the State's evidence was sufficient to support the conviction.*

*Answer 2: Yes.*

Dale Wilson contends the State failed to submit sufficient evidence to support his conviction for first degree rape of a child. He argues that the jury employed guess, speculation, and conjecture to conclude that he, rather than another, molested Betty Lewis. The State responds that the testimony of Betty Lewis and her family suffices to convict Wilson and the jury held the prerogative to consider Betty and other witnesses credible. We agree with the State.

Evidence is sufficient if a rational trier of fact could find each element of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221-22, 616 P.2d 628 (1980). Both direct and indirect evidence may support the jury's verdict. *State v. Brooks*, 45 Wn. App. 824, 826, 727 P.2d 988 (1986). In claiming insufficient evidence, the defendant necessarily admits the truth of the State's evidence and all reasonable inferences that can

11

be drawn from it. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Only the trier of fact weighs the evidence and judges the credibility of witnesses. *State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014).

Under RCW 9A.44.073: "A person is guilty of rape of a child in the first degree when the person has sexual intercourse with another who is less than twelve years old and not married to the perpetrator and the perpetrator is at least twenty-four months older than the victim." In our appeal, Betty Lewis, a seven-year-old at the time of the allegations, testified that Dale Wilson placed his penis in her mouth. Wilson's age substantially exceeded Betty's age by more than twenty-four months. During trial, Wilson did not dispute any elements of first degree child rape except whether Wilson committed the crime. As in many sexual offense cases, only the victim and the perpetrator know the truth of what occurred. Resolution depends on whom the jury believes. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

Dale Wilson must accept the credibility of Betty. Betty testified that Wilson visited her house. She testified that Wilson stuck his penis in her mouth more than once. According to Betty, Wilson spoke to her graphically about sex acts. Wilson showed her videos depicting naked people. Betty confidently identified Wilson as the perpetrator.

*Issue 3: Whether the sentencing court erred by failing to adequately address the Blazina factors before imposing LFOs?*

*Answer 3: Yes.*

12

On appeal, Dale Wilson contends that the trial court did not adequately inquire into his current and future ability to pay before imposing discretionary legal financial obligations. Nevertheless, Wilson did not object to the imposition of any legal financial obligations during sentencing. Thus, this reviewing court must determine whether to address an assignment of error not raised below.

RAP 2.5(a) provides, in relevant part: "The appellate court may refuse to review any claim of error which was not raised in the trial court." With regard to unpreserved challenges to legal financial obligations, the state Supreme Court declared: "A defendant who makes no objection to the imposition of discretionary LFOs at sentencing is not automatically entitled to review." *State v. Blazina*, 182 Wn.2d 827, 832, 344 P.3d 680 (2015). Each appellate court must render its own decision to accept discretionary review of claimed financial obligations not appealed as a matter of right. *State v. Blazina*, 182 Wn.2d at 835. The *Blazina* court, however, clarified that a challenge to the trial court's entry of a legal financial obligation order under RCW 10.01.160(3) is ripe for judicial determination despite the State having taken no steps to enforce the obligation. *State v. Blazina*, 182 Wn.2d at 832 n.1. A majority of this panel exercises its discretion and accepts review of the imposition of discretionary legal financial obligations because of the amount imposed.

By statute, the sentencing court may not order a convicted defendant to pay discretionary fees unless the defendant possesses or will possess the financial ability to pay. RCW 10.01.160(3) reads:

> The court shall not order a defendant to pay costs unless the defendant is or will be able to pay them. In determining the amount and method of payment of costs, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose.

In *State v. Blazina*, 182 Wn.2d at 838 (2015), our Supreme Court clarified that RCW 10.01.160(3) requires the trial court "do more than sign a judgment and sentence with boilerplate language stating that it engaged in the required inquiry." Rather, the "record must reflect that the trial court made an individualized inquiry into the defendant's current and future ability to pay." *State v. Blazina*, 182 Wn.2d at 838. This inquiry should address a defendant's incarceration, job status, debts, or other indicators of ability to pay. *State v. Malone*, 193 Wn. App. 762, 766, 376 P.3d 443 (2016).

The sentencing court conducted no inquiry into the financial condition or future earning capacity of Dale Wilson except to comment that Wilson would remain in prison for seven years and not be able to meet the $25 required monthly payment during the imprisonment. This limited inquiry supported the declination, not the imposition, of legal financial obligations. Therefore, this court remands for a new sentencing hearing to consider the imposition of discretionary legal financial obligations.

14

No. 33935-1-III
*State v. Wilson*

STATEMENT OF ADDITIONAL GROUNDS

*Issue 4: Whether the trial court violated Dale Wilson's right to a fair trial by allowing Wilson's conviction solely on speculation after two eye witnesses testified in court that Wilson was not the person who produced the physical nexus to the alleged crime and the prosecution neglected to investigate three alternate male suspects before trial?*

*Answer 4: No.*

Dale Wilson asserts additional grounds for possible reversal of his conviction in a separate filing. He first contends his conviction rests on insufficient evidence, and he emphasizes that two eye witnesses testified that he did not produce the physical nexus to the crime and law enforcement refused to investigate other suspects. We encounter some confusion as to what Wilson characterizes as the production of a physical nexus to a crime. We are uncertain as to how two eye witnesses could verify that Wilson did not rape Betty Lewis, when the rape occurred when Wilson was alone with Betty and Wilson presented no alibi witness to testify he was always present somewhere else when the sexual contact occurred. Also, Wilson cites no authority supporting an obligation on law enforcement to investigate other potential perpetrators under these circumstances. Regardless, we previously concluded that substantial evidence supports Wilson's conviction.

15

*Issue 5: Whether the hearsay used to convict Dale Wilson was unreliable and therefore unlawfully submitted as evidence in court?*

*Answer 5: No.*

In raising this fifth issue, Dale Wilson concedes that he may have agreed to the admissibility of Betty Lewis' hearsay testimony for trial purposes. Nevertheless, he argues that he did so only because of a prediction of an admissibility ruling in favor of the State by the trial court and he never stipulated to the use of the evidence to convict him. We disagree. A stipulation to admissibility of evidence permits the use of the evidence to convict. Wilson cites no authority to the contrary. Wilson received benefit by reason of the stipulation because the State recommended a sentence in the low end of the sentencing range.

*Issue 6: Whether the trial court erred when permitting Detective Darrin Darnell to testify at trial?*

*Answer 6: We refuse to address this issue because Dale Wilson did not object to Darnell's testimony at trial.*

On appeal, Dale Wilson contends that the trial court abused its discretion when it allowed the testimony of Detective Darnell as a witness. He emphasizes that Laurie Lund and Detective Darnell met before in an earlier case. Nevertheless, Wilson never objected to Darnell's testimony before the trial court.

RAP 2.5(a) formalizes a fundamental principle of appellate review. The first

16

No. 33935-1-III
*State v. Wilson*

sentence of RAP 2.5 (a) reads:

> **Errors Raised for First Time on Review.** The appellate court may refuse to review any claim of error which was not raised in the trial court.

No procedural principle is more familiar than that a constitutional right, or a right of any other sort, may be forfeited in criminal cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it. *United States v. Olano*, 507 U.S. 725, 731, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993); *Yakus v. United States*, 321 U.S. 414, 444, 64 S. Ct. 660, 88 L. Ed. 834 (1944).

Countervailing policies support allowing an argument to be raised for the first time on appeal. For this reason, RAP 2.5(a) contains a number of exceptions. RAP 2.5(a) allows an appellant to raise for the first time "manifest error affecting a constitutional right," an exception upon which a criminal appellant commonly relies. Constitutional errors are treated specially under RAP 2.5(a) because they often result in serious injustice to the accused and may adversely affect public perceptions of the fairness and integrity of judicial proceedings. *State v. Scott*, 110 Wn.2d 682, 686-87, 757 P.2d 492 (1988). Prohibiting all constitutional errors from being raised for the first time on appeal would result in unjust imprisonment. 2A KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE RAP 2.5 author's cmt. 6, at 218 (8th ed. 2014). On the other hand, "permitting *every possible* constitutional error to be raised for the first time on appeal undermines the trial process, generates unnecessary appeals, creates undesirable retrials and is wasteful

17

of the limited resources of prosecutors, public defenders and courts." *State v. Lynn*, 67 Wn. App. 339, 344, 835 P.2d 251 (1992).

Washington courts and even decisions internally have announced differing formulations for "manifest error." First, a manifest error is one "truly of constitutional magnitude." *State v. Scott*, 110 Wn.2d at 688. Second, perhaps perverting the term "manifest," some decisions emphasize prejudice, not obviousness. The defendant must identify a constitutional error and show how, in the context of the trial, the alleged error actually affected the defendant's rights. It is this showing of actual prejudice that makes the error "manifest," allowing appellate review. *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009); *State v. Scott*, 110 Wn.2d at 688; *State v. Lynn*, 67 Wn. App. at 346. A third and important formulation for purposes of this appeal is the facts necessary to adjudicate the claimed error must be in the record on appeal. *State v. McFarland*, 127 Wn.2d at 333 (1995); *State v. Riley*, 121 Wn.2d 22, 31, 846 P.2d 1365 (1993).

Dale Wilson cites no authority that disqualifies a witness because of earlier contact with another witness at trial. Wilson never sought to impeach Detective Darrin Darnell's credibility as an investigator at trial. He cites to no facts within the record to support his claim of bias beyond the general fact that Laurie Lund and Detective Darnell earlier met. We discern no manifest constitutional error.

*Issue 7: Whether the trial court erred when precluding Dale Wilson from presenting character evidence of Betty Lewis?*

18

*Answer 7: We refuse to address this issue because Dale Wilson did not question the constitutionality of the statute at trial.*

Dale Wilson contends that the rape shield law, RCW 9A.44.020 prevented him from presenting a complete defense under the Sixth Amendment to the United States Constitution when the statute precluded him from presenting defense witness testimony attacking the credibility of Betty Lewis but allowed hearsay from the victim. This court has previously held the statute constitutional. *State v. Summers*, 70 Wn. App. 424, 436, 853 P.2d 953 (1993). Dale Wilson cites no decision to the contrary, and he fails to provide a reasoned analysis for overruling precedent. Thus, his claimed error is not manifest constitutional error.

*Issue 8: Whether the State committed misconduct when asking Laurie Lund if she believed Betty Lewis' allegations against Dale Wilson?*

*Answer 8: We refuse to address this issue because Dale Wilson did not object to Lund's testimony at trial.*

Dale Wilson next contends that the prosecutor committed misconduct by asking Laurie Lund if she believed Betty Lewis' allegations. The defendant's counsel did not register an objection to this question. Witnesses are not generally allowed to vouch for the credibility of other witnesses, as this veers into the jury's arena. *State v. Chavez*, 76 Wn. App. 293, 299, 884 P.2d 624 (1994). A prosecutor commits misconduct when asking a witness to vouch for another witness's credibility. *State v. Chavez*, 76 Wn. App.

19

at 299. Nevertheless, Wilson placed the credibility of Betty Lewis at issue when his counsel questioned Laurie Lund as to Betty's history of telling the truth. Therefore, Wilson establishes no manifest constitutional error.

*Issue 9: Whether the trial court issued an illegally constructed search warrant, which resulted in the seizure of property belonging to an uninvolved citizen with zero probable cause?*

*Answer 9: We refuse to address this issue because Dale Wilson provides no law to support his argument.*

Dale Wilson contends that the search warrant that seized his and his sister's computers from their residence was illegally "constructed" because it did not state with particularity the objects to be seized. He may complain that, because law enforcement also seized the property of another resident of his house, the warrant lacked specificity. Wilson cites none of the trial record concerning the background of the issuance of the warrant, and Wilson cites no legal precedent that guides the court to consider that a computer belonging to his sister but situated within Wilson's home would not be within the scope of a search warrant.

RAP 10.3(a)(6) directs each party to supply, in its brief, "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." We do not consider conclusory arguments that are unsupported by citation to authority. *Joy v. Department of Labor & Industries*, 170 Wn.

20

No. 33935-1-III
*State v. Wilson*

App. 614, 629, 285 P.3d 187 (2012). Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration. *West v. Thurston County*, 168 Wn. App. 162, 187, 275 P.3d 1200 (2012). Therefore, this court should decline to address this unsupported assignment of error.

## CONCLUSION

We affirm Dale Wilson's conviction for rape of a child. We remand the case for the trial court to reconsider the imposition of legal financial obligations consistent with the directions in this opinion.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, C.J.

WE CONCUR:

_____
Korsmo, J.

_____
Lawrence-Berrey, J.

21